[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 966 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 967 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 968 
OPINION
Paul D., the biological father of Sarah C., appeals orders denying his Welfare and Institutions Code[1] section 388 motion and terminating his parental rights pursuant to section 366.26. On appeal, Paul contends he should have been considered Sarah's presumed father, the court erred in finding the department of social services (Department) used due diligence to locate him, the court erred in denying him reunification services and erred in applying an improper legal standard. We affirm.
 FACTS
In June 1987, while he was in the Navy, Paul met Sarah's mother, Dawn C. Dawn was then married to Mr. C. who was also in the Navy. Around December 1987, Dawn told Paul she was pregnant with his child. Paul did not offer to help Dawn with her pregnancy in any way.
Sarah was born in September 1988. Dawn named Mr. C. as Sarah's father on the birth certificate because she did not want him to know Paul was Sarah's father. Mr. C. believed Sarah was his daughter until shortly before a hearing in September 1991.
In late 1988, Paul moved in with Dawn and Sarah who were staying at a friend's house. Dawn testified the relationship was "kind of casual." Paul testified he never discussed the possibility of a future relationship with Dawn because she was married. Paul lived in the house with Dawn and Sarah for a few months until he was arrested for being absent without leave. During those months, he fed Sarah, changed her diapers and played with her. He felt very close to her. He testified he told a few friends that Sarah was his child. He did not, however, generally contribute money towards the rent or to support either Sarah or her mother. Only one time did he contribute any money and that was when Dawn failed to receive money from Mr. C. Paul did not attempt to have himself named Sarah's father on her birth certificate or complete any paperwork with the Navy to have Sarah named a beneficiary on insurance or a dependent. *Page 970 
After Paul was released by the Navy in April 1989, Paul attempted to find Dawn and Sarah but they had moved. He spent part of one day driving around looking for them. Later that day he left for his home in Massachusetts. He asked a friend to keep a lookout for them.
Over the years, Paul's only efforts to find his daughter consisted of talking to his friend in San Diego. Paul never tried to find Dawn and Sarah through the Department although he knew Dawn's three other children were all in foster homes due to petitions filed by the Department. He never contacted Dawn's mother in Long Beach to try to find Sarah.[2] Paul never asked his father, an ex-police officer, for help in finding Sarah nor did he contact San Diego law enforcement authorities.
In June 1989, the Department filed a petition under section 300, subdivision (b) on Sarah's behalf alleging Sarah was not being provided with adequate medical care and was at risk due to Dawn's abuse of methamphetamine. Dawn told the social worker Mr. C. was Sarah's father. The court, assuming Mr. C. was Sarah's father, declared Sarah a dependent child of the juvenile court and placed her in foster care.
Sometime later, Dawn informed the social worker that Paul was Sarah's father. Dawn had no information on the correct spelling of Paul's last name, his date of birth, address, social security number or work place. The Department initiated a search for Paul on June 25, 1989 but the Parent Search Unit was unable to find Paul due to the lack of information. The Department initiated another search on November 29, 1989, using a possible date of birth suggested by Dawn and numerous alternate spellings of Paul's last name, none of which were correct. In February 1990, the Navy returned the Department's request because of the lack of sufficient information.
In May 1990, Dawn visited Paul's friend in San Diego. She told him Sarah was in foster care. During a telephone conversation with Paul, the friend told Paul about the visit with Dawn. Paul did not seem surprised Sarah was in a foster home. The friend believed Paul "must have already known that Sarah was . . . in a foster home."
The Department initiated a third search for Paul in July 1990. The Department checked records of the welfare department, probation department, local law enforcement, records in New Bedford, Massachusetts, and the local phone directory. As a result of this search the Department learned *Page 971 
Paul had been jailed in May 1987 and released to a Navy ship, but the Department did not obtain a civilian address.
In July 1990, the court terminated the reunification services to the parents and ordered a section 366.26 permanency planning hearing be held in November 1990.
In October 1990, the Department found the father by using a Navy Locator phone number. On October 25, 1990, Paul wrote a letter to the court stating he wished to establish his parental rights as Sarah's father and requesting an attorney be appointed to represent him.
The November 1990 permanency planning hearing was continued to allow for proper notice to the parents. In December 1990, the court ordered paternity testing. The tests showed a 99.97 percent probability Paul fathered Sarah.
On March 7, 1991, the court ordered reunification services for Paul, but rescinded its order on March 20, 1991.
On June 7, the court continued the section 366.26 hearing because the court wanted briefing on the paternity issue. Also on June 7, Paul filed a motion under section 388 seeking to modify the court's July 1990 order terminating reunification services and continuing Sarah in a confidential foster home.
In September 1991, the court conducted the hearing on Paul's section 388 motion and a section 366.26 permanency planning hearing. The court denied Paul's motion, found clear and convincing evidence to support a finding Sarah was adoptable and terminated his parental rights.
 DISCUSSION I Presumed Father Status (1a) Paul contends the court erred in not presuming him to be Sarah's natural father pursuant to Civil Code section 7004, subdivision (a)(4).
Notice of a dependency proceeding must be given to "both parents and any guardian of the minor." (§§ 332, 335, subd. (a).)
"The dependency provisions of the Welfare and Institutions Code do not define `parent' or `parental custody.' Black's Law Dictionary (6th ed. 1990) *Page 972 
page 1114, defines a `parent' as `[t]he lawful father or mother of a person.' (2) The term includes the natural mother and father of a child born of their marriage, an adoptive father or mother, a natural mother of an illegitimate child, and, under some circumstances, a father of an illegitimate child if the status of father has been judicially conferred upon him. [Citation.]
". . . . . . . . . . . . . . . . . . . . . . . . . . . .
"[I]n using the word `parent' the Legislature intended to refer to a person upon whom that status has been legally conferred — that is, a natural or adoptive parent." (In re Jodi B. (1991)227 Cal.App.3d 1322, 1326, 1328 [278 Cal.Rptr. 242].)
The "legally conferred" status of a father is set forth in Civil Code section 7004 which provides when a man will be regarded as a child's "presumed father." (3) "The statutory purpose [of Civil Code section 7004] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not. [Citations.]" (In re Sabrina H. (1990) 217 Cal.App.3d 702, 708 [266 Cal.Rptr. 274] .) The Supreme Court has also suggested that a biological father may be accorded parental rights when his attempt to achieve presumed parent status is thwarted by the child's mother and he "promptly comes forward and demonstrates a full commitment to his parental responsibilities — emotional, financial, and otherwise. . . ." (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)
Under Civil Code section 7004, a man is presumed to be a child's father based on the father's relationship with the mother, e.g., marriage or attempted marriage to the mother (see Civ. Code, § 7004, subds. (a)(1), (2), (3)) or commitment to the child, e.g., acknowledging paternity and providing a home (see Civ. Code, § 7004, subds. (4), (5)). Under both Civil Code section 7004 and the Supreme Court decision in Kelsey, the father's rights flow from his relationship (or attempted relationship) to the mother and/or child and not merely from his status as the biological father.
Subdivision (a)(4) of section 7004 provides "[a] man is presumed to be the natural father of a child if . . . [¶] . . . [h]e receives the child into his home and openly holds out the child as his natural child."
(1b) Paul argues insufficient evidence supports the court's conclusion he was not a presumed father pursuant to Civil Code section 7004, subdivision (a)(4). We disagree.
Here, while there was uncontroverted evidence indicating Paul acknowledged Sarah was his daughter to a few friends and to his family and that for *Page 973 
a few months he cared for Sarah, there was also evidence indicating he never sought to have himself listed on Sarah's birth certificate as her father, never sought to tell Mr. C. Sarah was not Mr. C.'s daughter and never completed any paperwork with the Navy to have Sarah named as a dependent or a beneficiary of any insurance.
Other evidence tended to show Paul did not provide a home for Sarah. Paul moved in with Sarah and her mother because he needed a place to stay. He lived with Sarah and Dawn for only a short period of time. He only once contributed any money to provide for a home (i.e., to pay for rent, food, etc.); people other than Paul (e.g., Dawn's friends and Mr. C.) were the ones providing a home for Sarah. Paul lived with Sarah in the same home for only a brief period of time and once arrested for being absent without leave did not provide her with a home.
This evidence supports a finding Paul did not openly acknowledge Sarah as his daughter or receive her into his home; he only incidentally provided care for Sarah during a brief period while he was living with Dawn and her friends.
We conclude substantial evidence supports the court's determination Paul was not a presumed father within the meaning of Civil Code section 7004, subdivision (a)(4).
 II Diligence of Department's Efforts to Locate Paul (4) Paul contends substantial evidence does not support the court's conclusion the Department exercised due diligence in trying to locate him.
As the county points out, technically, Paul was not entitled to notice until his paternity was established, an issue which was not determined until the November 1991 decision of the court. However, even assuming the Department had a duty to attempt to locate Paul so he could establish his paternity and attempt to reunify with Sarah once Dawn informed the Department Paul was Sarah's father, we would not reverse.
At the outset of the dependency, the Department reasonably assumed Mr. C. was the father since he was listed on the birth certificate and Dawn stated Mr. C. was the father. Once the Department learned Mr. C. was not Sarah's father, the Department immediately began searching for Paul. The Department's efforts were thwarted by its lack of information, e.g., it lacked a *Page 974 
correct spelling of Paul's last name, his date of birth, his address, and his work place. The Department initiated multiple searches for Paul over a period of a year and a half, finally locating him in October 1990 through a Navy Locator number.
Paul complains that since the Department quickly found him through the Navy Locator number when it called in October 1990, the Department was remiss in not earlier using the number to find him. Initially, we note the Department did contact the Navy during one of its earlier searches, but the Navy was unable to locate Paul because of the lack of information. The fact that the Department tried the Navy a second time despite having little additional information hardly shows a lack of diligence on the Department's part. Further, the record does not establish the Navy Locator number was available at the time of the earlier searches.
We conclude substantial evidence supports the trial court's determination the Department exercised due diligence in attempting to locate Paul.
 III Denial of Reunification Services (5a) Paul contends the court erred in denying him reunification services after he was finally located by the Department. He explains:
"[He], as the biological father, has a right to reunification services pursuant to state law. For the State to terminate the fundamental rights inherent in a parent-child relationship without providing any reunification services to a parent who has demonstrated a right and desire for them would not only be a miscarriage of justice, it would violate the constitutional rights of due process to which both Appellant and his daughter, [Sarah], are entitled."
Initially, we observe we have doubts about the premise of Paul's argument, i.e., that he, as a biological father, has aright to reunification services under state law. As we pointed out in part I, parental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother/and or child through marriage (or attempted marriage) or his commitment to the child. Nothing in juvenile dependency law states reunification services must be provided to a man solely based on his status as the biological father.
State law provides the court must order reunification services be provided to the parent for up to 18 months whenever a child is removed from a *Page 975 
parent's custody unless the court finds by clear and convincing evidence that (1) the whereabouts of the parent are unknown despite reasonably diligent search efforts to find the parent unless the parent is found within six months of the out-of-home placement of the child, (2) the parent suffers from a mental disability rendering him or her incapable of utilizing the services, (3) the child was previously removed from parental custody due to sexual or physical abuse, was returned to the parents, and again removed due to additional physical or sexual abuse, (4) the parent caused the death of another child through abuse or neglect or (5) the child suffered severe physical abuse by a parent or person known to the parent when the parent knew or reasonably should have known the person was physically abusing the minor. (§§ 361.5, subds. (a), (b), (d), 366.21, subd. (g)(1).)
Nothing in this section specifically states the services must be provided to a man who is only the biological (versus presumed) father of the child. We doubt, in light of the statutory purpose, that the Legislature intended to mandate reunification services solely based on the status of being the biological father. For example, we think it highly unlikely the Legislature intended to give a right of reunification services to a rapist or an anonymous sperm donor simply because the man is the biological father of the child. We also question whether the Legislature intended to mandate reunification services for a man solely because he was the biological father when the child also had a presumed father married to the child's mother who had cared for the child over a period of many years as if the child were his own. (See discussion in Michael H. v. Gerald D. (1989)491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333].)
(6) The purpose of reunification services is to "reunite the family in a situation where the best interests of all concerned, the child, the parent and society as a whole, are well served." (In re Jamie M. (1982) 134 Cal.App.3d 530, 545 [184 Cal.Rptr. 778] .) This purpose is furthered by providing services to the presumed father who has had at least some sort of familial relationship to the child before the juvenile court removed the child. This same purpose is not necessarily furthered in the case of a strictly biological father who has never had any kind of substantial familial relationship to the child. In such case, the provision of services does not "reunite" a family but creates a new one.
The Supreme Court has observed:
"`Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' [Citation.] *Page 976 
". . . . . . . . . . . . . . . . . . . . . . . . . . . .
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." (Lehr v. Robertson
(1983) 463 U.S. 248, 260, 262 [77 L.Ed.2d 614, 625, 627, 103 S.Ct. 2985].)
(5b) Based on our reading of the statute and applicable law, we conclude a man does not have a right to reunification services merely based on his status as the biological father of the child. In a case where the man is neither the presumed father of the child nor has been thwarted in his effort to become a presumed father by the unilateral actions of the mother, we believe the court has discretion to deny reunification services to the biological father.
(7) We also note that in the procedural context of this case, the court had discretion to deny Paul reunification services. The request for reunification services here was made after the court had already ordered a section 366.26 permanency planning hearing be held. A referral to a section 366.26 hearing may properly be made in some circumstances without providing reunification services to a father as early as six months after the child has been placed out of parental custody if the whereabouts of the father remain unknown despite reasonably diligent search efforts. (§ 366.21, subd. (e).) Paul sought reunification services through a section 388 motion.
Section 388 provides:
"Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and . . . shall set forth in concise language any change of circumstance or new evidence which are alleged to require such change of order or termination of jurisdiction.
"If it appears that the best interests of the child may be promoted by the proposed change of order or termination of jurisdiction, the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given. . . ." *Page 977 
A decision that changed circumstances or new evidence merits a change, modification or setting aside of an order will involve the court's discretion.
Based on the record here, we find the court properly decided not to order reunification services to Paul.
At the time of the hearing, Sarah had been in foster care for over two years. She had a need for a permanent, stable home. Paul had not seen Sarah since early 1989. After he was arrested for being absent without leave, he made only token efforts to locate her. Once he was informed she was in foster care, first by his friend and then by the Department, he made no effort to contact Sarah or to establish a relationship with her. He did not send her any gifts, letters or photographs of himself.[3] He did not attempt to visit her. He did not provide her with any support. Although he was provided with a reunification plan in March 1991 and reunification services for a short period in March 1991, Paul's only attempt to comply with the reunification plan was to attend Alcoholics Anonymous meetings. He did not attend a parenting class, obtain therapy, or have a psychological evaluation or drug test.
At the time of the hearing, Paul had still given no thought as to how he might reintroduce himself to Sarah, had not set aside any money for her support and had only vague ideas of how he would care for her if he were awarded custody.
Given Paul's status as a mere biological father who had done almost nothing to develop a relationship with his daughter either before or during the dependency and who had only vague plans of how he would care for Sarah at the time of the hearing and given the fact Sarah had been in foster care for over two years at the time of the hearing, we believe the court did not abuse its discretion in denying Paul's section 388 motion seeking reunification services.[4] *Page 978 
 IV Soldiers' and Sailors' Civil Relief Act (8) Paul contends the reunification period should have been tolled while he was in the Navy pursuant to the Soldiers' and Sailors' Civil Relief Act. The county argues Paul has waived this issue by failing to pursue it below.
Paul's argument of this tolling provision before the trial court was contained in his trial memorandum, where he stated:
"Soldiers and Sailors Relief Act, 50 U.S.C. Appendix Section 510 requires the court to toll the reunification period while a serviceman is in the military service. Fifty United States Code, Appendix Section 521 provides that an action shall be stayedupon motion by the serviceman during his or her period ofservice. In re Melicia L. (1988) 207 Cal.App.3d 51; 254 Cal. Rrtr. [sic] 541. Because [Paul] was in the military during the reunification period and did not know of the juvenile court proceeding, the statute should be tolled, since Federal law preempts conflicting State law." (Italics added.)
In In re Melicia L. (1988) 207 Cal.App.3d 51, 54 [254 Cal.Rptr. 541, we explained the father must request a stay in order to invoke the tolling provisions of the Soldiers' and Sailors' Civil Relief Act: "Absent an application [for a stay], a serviceman is not entitled to vacation of an adverse judgment. [Citation.]"
Paul never applied for a stay of the proceedings. Therefore, he is not entitled to have the judgment vacated based on the Soldiers' and Sailors' Civil Relief Act.
 V Applicable Standard of Law (9a) Paul contends the court applied the wrong standard of law in terminating his parental rights at the section 366.26 permanency planning hearing by focusing on Sarah's best interests. Paul explains:
"Because of the fundamental nature of the interest in family autonomy, the State must prove its allegation of parental unfitness by at least `clear and convincing' evidence. [Citation.] It appears that the Court altogether failed to determine that Appellant was unfit, or alternatively used a lesser standard similar to the preponderance of evidence standard." *Page 979 
Paul contends the court also improperly applied a best interests of the child standard and improperly weighed the advantages and disadvantages of awarding Sarah to her biological father rather than to the foster parents.
(10) We begin by noting the findings required at a section 366.26 hearing are quite limited. The focus of the hearing is on selecting a permanent plan of care for the child; the court "has only the circumscribed options of adoption, guardianship or long-term foster care for the child, none of which directly involves the parent." (In re Taya C. (1991) 2 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 810].) The court is required only to find that clear and convincing evidence establishes the child is likely to be adopted, reunification services were properly terminated or not offered, and termination of parental rights would not be detrimental to the child for certain extraordinary circumstances not pertinent here before ordering adoption and terminating parental rights. A finding of parental "unfitness" is not part of the section 366.26 hearing.
Nowhere in the statutory scheme is the court specifically required to find the parent "unfit." The statutory scheme envisions a maximum period of 18 months for keeping a child in a temporary custody arrangement while making efforts to reunify the family. The proceedings begin with the jurisdictional finding by a preponderance of the evidence that a child needs the protection of the juvenile court for one of the reasons stated in section 300. (§§ 300, 355.) Next, the court makes a dispositional order, removing the child from parental custody only if the court finds clear and convincing evidence establishes it would be detrimental to return the child to the parents. (§ 361.) Thereafter, review hearings occur every six months and the court is required to return the child to parental custody at the end of each hearing unless the court finds return "would create a substantial risk of detriment to the physical or emotional well-being of the" child. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).)
At the final review hearing, if the court finds the child cannot be returned to parental custody without substantial risk, the court must terminate reunification services and order a section 366.26 permanency planning hearing unless clear and convincing evidence establishes the child is not adoptable and no one is willing to accept guardianship of the child, in which case the court may order long-term foster care. (§§ 366.21, subd. (g); 366.22, subd. (a).)
When the court refers a child to a section 366.26 permanency planning hearing, at either the 12-month or 18-month hearing, reunification services to the parents are terminated. (§§ 366.21, subd. (h); 366.22, subd. (a).) We *Page 980 
have observed that "[f]or all practical purposes, the tie between parent and child is severed by the referral to the section 366.26 hearing, because the court has terminated efforts to reunify the family. . . ." (In re Taya C., supra, 2 Cal.App.4th 1, 7.)
The parent who has lost custody of his or her child is given a finite time within which to remedy the fault which caused the loss. If the parent fails to make the necessary changes in his or her life and circumstances within 12 months, or 18 months at the outside, the state "gives up" on that parent and focuses on the best possible alternative for the child, other than returning the child to the parent. This seemingly arbitrary cutoff of concern for parental interests is justified by the desire to provide an early selection of a permanent, stable home for otherwise displaced children. (See In re Heather P. (1989) 209 Cal.App.3d 886, 892 [257 Cal.Rptr. 545].)
(11) During the final step in the process, the section 366.26 permanency planning hearing, the court is not required to make another finding by clear and convincing evidence that returning the child to the parent would be detrimental before selecting adoption and terminating parental rights. A clear finding of detriment by clear and convincing evidence is not required at the section 366.26 hearing because the statutory scheme of hearings and reviews has adequately protected a parent's interests. (SeeIn re Cristella C. (1992) 6 Cal.App.4th 1363 [8 Cal.Rptr.2d 342] .) At the time of the section 366.26 hearing, reunification efforts have terminated and the only remaining question is to determine a permanent plan of care for the child outside parental custody.[5]
(9b) Among the aims of the statutory scheme is protecting parental rights of fathers who have some familial relationship to the child; a protection implemented by a series of required findings and review hearings monitoring the progress of reunification efforts. Nothing in the statutory scheme specifically requires a court to make a finding of parental unfitness for a biological father who does not come forward until after the court has made a referral to a section 366.26 permanency planning hearing. *Page 981 
To the extent Paul's challenge is to the findings and orders made by the court here which touch generally on the "unfitness" of the parents, we initially note Paul has limited rights to challenge the findings because his status is merely that of the biological father. Second, not only is it too late to challenge those orders, but also Paul does not make any claim that Sarah was not in need of the juvenile court's protection due to the risks she faced from inadequate medical care and the drug abuse of her custodial parent nor does Paul claim Sarah was wrongfully placed in foster care. As to the referral order, this was the subject of Paul's section 388 motion which we have held was properly denied.
In sum, because the facts show Paul was merely a biological father who had demonstrated no willingness to accept full parental responsibilities for Sarah the court was not required to make a particularized finding Paul was "unfit," and was entitled to focus on Sarah's best interests in deciding to not offer reunification services and terminate Paul's parental rights so Sarah could be adopted.
As to Paul's final argument that the court improperly based its decision on pitting Paul against the foster parents, we find no merit; his argument is not supported by the record. Paul's argument is based on quoting the court out of context. When read in its entirety, it is clear the court based its decision on proper factors.
 DISPOSITION
The judgment is affirmed.
Wiener, J., and Nares, J., concurred.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] Dawn testified Paul knew her mother and sister lived in Long Beach and knew her mother's full name. Paul testified he knew Dawn had family in Long Beach and that she probably told him the last name but he did not then know it.
[3] At Paul's request, the Department sent him a photograph of Sarah. The Department suggested Paul send Sarah a photograph of himself. He failed to do so. When asked why at the hearing, he answered, "No reason actually."
[4] Paul also complains he was never afforded an opportunity to reunify with his daughter, explaining the denial of reunification services was "a direct result" of the Department's failure to conduct a diligent search for him.
Our first response is to point out that we have rejected his argument the Department did not diligently search for him. We also observe that primary responsibility for the failure of reunification must rest with Paul. Paul's failure to seek out Sarah in the years after his separation from Dawn and to try to establish a relationship with her and prepare a home for her after he learned she was in foster care is the primary reason why he has not reunified with her.
[5] The issue of whether the constitutional guarantee of due process requires the court to find by clear and convincing evidence at the section 366.26 hearing that returning the child to his or her parents would be detrimental before the court may terminate parental rights is currently pending before the California Supreme Court. (See Cynthia D. v. Superior Court
(1992) 3 Cal.App.4th 913 [4 Cal.Rptr.2d 909], review granted Apr. 23, 1992 (S025807).) We note that in Cynthia D. this court found the statutory scheme constitutional.
In his brief, Paul cites In re Michaela C. (Cal.App.) in support of his argument the court was required to make a finding of his unfitness by clear and convincing evidence. This case also upheld the constitutional validity of the statutory scheme but has been ordered depublished (Reporter of Decisions ordered not to publish this opinion [A048699, A050714] in the Official Reports on Apr. 23, 1992). *Page 982