Filed 12/1/15  In re N.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E063702 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J254306 & J254307) |
| v. | OPINION |
| M.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Dismissed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Shobita Misra, under appointment by the Court of Appeal, for Defendant and Appellant S.R.

1

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

Appellant M.M. (father) appeals from the juvenile court's denial of his Welfare and Institutions Code[1] section 388 petition regarding his child, N.M. (the child). He also challenges the court's order terminating his parental rights. Appellant S.R. (mother) filed a separate brief joining in father's appeal. We conclude that because father was not a presumed father, his appeal should be dismissed. Accordingly, mother's appeal is also dismissed.

FACTUAL AND PROCEDURAL BACKGROUND

On April 17, 2014, the San Bernardino County Department of Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was five years old at the time, and N.G., who was two years old.[2] The petition alleged that the child and N.G. (the children) came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petition included the allegations that mother had a substance abuse problem and a criminal history, that she had engaged in domestic violence in front of the children, and that she had an unstable living environment. It also alleged that mother's and father's whereabouts were unknown.

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] N.G. is not a subject of this appeal.

The social worker filed a detention report, stating that CFS received a referral on February 8, 2014, alleging severe neglect to N.G. Mother had allegedly taken her to a hospital and claimed she was hallucinating. Mother appeared to be under the influence, but refused testing for herself and N.G. Then, on April 7, 2014, CFS received another referral, stating that mother was "delirious" and the children were "brain washed."

On April 14, 2014, a relative (the relative) contacted CFS to report that she had the children in her care and that mother was "delusional" and "on drugs." The relative reported that she had searched for mother and the children and found them sleeping in front of a liquor store. The next day, a social worker obtained a detention warrant to take the children into CFS custody. The child stated that her mother lived on the streets. As of the writing of the detention report, the social worker had not been able to locate or contact mother. Furthermore, there was no information on the alleged fathers of the children.

On April 18, 2014, the court held a detention hearing. The relative appeared and said she had no idea where mother or father were. The social worker informed the court that mother was arrested and released the previous night. The social worker was able to give mother notice of the hearing, when she was arrested, and told her she needed to appear. Mother apparently called CFS and said she was not going to attend the hearing. The court removed the children from mother and the alleged fathers[3] and detained them in foster care.

---

[3] N.G. apparently has a different father than the child.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on May 5, 2014, recommending that reunification services be provided to mother. Since father was only an alleged father, the social worker recommended no services for him. The social worker was unable to interview mother, since her current whereabouts were unknown. According to sheriff's records, she was arrested for drug possession and released from custody on April 17, 2014. Mother did not attend the detention hearing and had not made any attempt to contact CFS. The social worker reported that there was not enough information to assess paternity.

The social worker filed declaration of due diligence on May 9, 2014, indicating search efforts made to locate father. The declaration stated that, on April 28, 2014, one of the addresses found for father was 19051 E. Linvale Place in Aurora, Colorado (the Colorado address).

The court held a jurisdiction/disposition hearing on May 9, 2014. The court indicated its understanding that there was still one address that needed to be checked out on father. Thus, his whereabouts were still unknown. In another declaration of due diligence, the social worker reported that personal service was attempted on May 22, 2014, at the Colorado address, but the homeowner informed the process server that father did not live at that address. The homeowner said he had lived at that address for 10 years and did not know father.

4

A contested jurisdiction/disposition hearing was held on June 5, 2014. Mother appeared with counsel, but father's whereabouts were still unknown. The court received into evidence the declarations of due diligence. The court found that the children came within the provisions of section 300, subdivisions (b) and (g), declared them dependents of the court, and placed them in the home of a relative. The court ordered mother to participate in reunification services. The court found that father remained an alleged father, who was not entitled to reunification services.

Furthermore, counsel for the children asked for a temporary restraining order against mother, which the court granted. The court subsequently granted a permanent restraining order, in effect for three years.

*Section 387 Petition*

On November 5, 2014, the social worker filed a section 387 supplemental petition, alleging that, while in the care of the relative caregiver, N.G. was physically and sexually abused, and neglected. In a detention report, the social worker recommended that both N.G. and the child be placed in a more restrictive level of care. On November 6, 2014, the court ordered the children detained from the relative caregiver. The court placed the child in a foster home and noted that N.G. was hospitalized. N.G. was subsequently placed in a different foster home than the child.

*Six-month Status Review*

The social worker filed a six-month status review report on November 26, 2014, recommending that services for mother be terminated and a section 366.26 hearing be set.

The social worker reported CFS hoped to place the child and N.G. in the same home with the permanent plan of adoption.

On December 5, 2014, CFS filed its third declaration of due diligence describing its search efforts for father to provide notice of the six-month review hearing.

The court also held the six-month review hearing on December 5, 2014. Father did not appear. The matter was set contested on behalf of mother, and the court authorized N.G. and the child to be placed together.

On December 14, 2014, the court held a contested six-month review and section 387 hearing. The court found that the children came within section 387. The court further found that the previous disposition was not effective in protecting the children and that it was in their best interests to consider termination of parental rights at a section 366.26 hearing. The court continued the children as dependents of the court and maintained them in the same foster home. It then terminated reunification services. The court set a section 366.26 hearing for April 16, 2015.

CFS filed a fourth declaration of due diligence on February 20, 2015. Father's whereabouts were still unknown. At the notice review hearing on February 20, 2015, the court continued the matter at the request of CFS so that notice could be published for father. The court ordered service to be made upon father by publication in the San Bernardino County Sun newspaper, since personal service could not be made.

6

*Section 366.26*

The social worker filed a section 366.26 report on April 14, 2015, requesting the court to continue the matter for 120 days. Since the children had been together in their current placement for just three months, CFS wanted more time to assess the placement and the children's attachment to the family. The social worker reported that the foster mother wanted to adopt them. They both called her "mommy" and were bonded with her. The child asked the social worker if she could "live with her [foster mother] forever." She was observed to be very comfortable in her foster home.

CFS filed additional information to the court on April 16, 2015. Father finally met with the social worker at the CFS office. He explained that he moved from Redlands, California to Colorado to get a job, and he resided with his sister at the Colorado address. He had been living there for approximately one year. Father said the last time he saw the child was on February 13, 2014, when mother was between homes. He said that mother consistently made it difficult to see the child, claiming that she had her male family members threaten to "beat him up" when he requested to see the child. He said he and mother had a very short relationship, but he was at the hospital when the child was born, and he was on the birth certificate. Father said he did not know that the child was removed from mother until he was "looking into clearing up Child Support case [*sic*]."

The court held a section 366.26 hearing on April 16, 2015, and father appeared with counsel. Father's counsel requested visitation for father with the child. She also stated that she "[would] be requesting that he be raised to presumed [father status]" and

7

that she would probably have to file a section 388 petition. She said she needed more time to file it. The court stated that it would be expecting a section 388 petition from counsel and that, in the meantime, it would not order visitation. The court continued the hearing to June 16, 2015.

*Section 388*

Father filed a section 388 petition on May 21, 2015. It requested the court to grant him custody of the child or, in the alternative, reunification services and visits. Attached to the section 388 petition was a declaration by father's counsel. The declaration claimed that the record did not indicate that father received notice for any of the hearings, except for the section 366.26 hearing. It also claimed that father was present at the child's birth, he signed a voluntary declaration of paternity, his name was on the birth certificate, and he had always held the child out as his own. The declaration further stated that father lived with mother and the child for six months, and that, after he and mother terminated their relationship, he had the child at his home every weekend for two years. After that, he would visit the child "as often as possible and when he could locate Mother."

The social worker filed a response to the section 388 petition, recommending that the petition be denied. The social worker reported that she spoke with father on May 29, 2015. Father said his last contact with the child was in February 2014. He said that he had contact with her every other month due to him being unable to locate mother. Father denied receiving notice for the April 18, 2014 detention hearing, the June 5, 2014 jurisdiction/disposition hearing, or the December 17, 2014 six-month review hearing. He

8

said he discovered that the child was taken into custody when his godfather informed him of the hearing on April 16, 2015. However, the social worker reviewed the case and noted that a notice of service was attempted at his sister's residence at the Colorado address. The social worker had also contacted father's sister, who said she had lived at the Colorado address for nine years. The sister told the social worker that "someone from child support" was looking for father; however, he was not living with her at the time. The sister informed father regarding the notice served, but he "did not do anything until later and that is when we found out they were taken and we went to the last Court hearing." The social worker concluded that notice was served on April 28, 2014, at the Colorado address and father chose not to respond. It also appeared that father never established a relationship with the child, due to his limited contact with her. The child was currently in a foster home with her sister and had been there since December 5, 2014. She was very bonded with the foster mother. Thus, although father was now open to having custody of the child, the social worker opined that it would be unfortunate to remove her from a place she called home and place her with someone she barely knew.

The court held a hearing on the section 388 petition on June 4, 2015. Father argued that he was never properly served notice of any hearings, except the section 366.26 hearing. He stated that he had been living at the Colorado address for over one year. Father requested that the court "undo the original JD hearing and findings and orders," and either return the child to his custody, or "receive reunification services for his sister," who wanted to be considered for placement. County counsel stated that CFS

made due diligence efforts to locate father, but was unable to do so. County counsel pointed out that the process server went to the Colorado address when trying to serve notice of the jurisdiction/disposition hearing and was informed that father did not live there. County counsel also pointed out that father left the state in February 2014 on his own and stopped having contact with the child. Thus, CFS's position was that it made diligent efforts throughout the case to notice father, and any lack of notice was due to father's own negligence in not maintaining a relationship with the child. Moreover, the child was in a home that was willing to adopt her. CFS did not believe there had been a change of circumstance and did not believe it would be in the child's best interest to grant the section 388 petition.

After hearing argument from counsel, the court found that the efforts of CFS to locate father constituted due diligence. The court remarked that father had "absented himself from his child's life for a significant period" and noted that his sister acknowledged she had told him about at least one hearing, and father "didn't do anything until later." The court concluded that it was clearly not in the child's best interest to grant the petition, noting that the child had a bonded relationship in the concurrent planning home, but did not really have a relationship with father.

Father then requested a "goodbye" visit with the child, but the child's counsel objected, stating that it would not be in her best interest. The child's counsel further pointed out that father's claim that he had visitation with the child every other weekend was never confirmed. The detention report stated that a relative had taken the child in

10

because mother was using drugs and was sleeping in front of a liquor store. Counsel did not believe father was having regular visits when the child was "basically in a homeless situation." The court found that father had been absent from the child's life for a significant period of time, so a visit with father would confuse her. Thus, it concluded that visitation was not in her best interest.

*Continued Section 366.26 Hearing*

The continued section 366.26 hearing was held on June 16, 2015. Father was present with counsel. He again requested visitation and objected to termination of his parental rights. The court proceeded to find that the child was likely to be adopted and terminated parental rights.

## ANALYSIS

### I. Father Was Not a Presumed Father

Father contends that the juvenile court abused its discretion in denying his section 388 petition. He also argues that the court erred by terminating his parental rights without finding that he was an unfit parent. Respondent argues father does not have standing to appeal, since he was not a presumed father; as such, father's appeal should be dismissed. We agree with respondent.

A. *Father Was Merely an Alleged Father*

"The Uniform Parentage Act [citation] provides the statutory framework by which California courts make paternity determinations. [Citations.] Under this statutory scheme, California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers.

11

[Citation.] 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father. [Citation.]' [Citation.] 'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .' [Citation.] [¶] 'Presumed' fathers are accorded far greater parental rights than alleged or biological fathers. [Citation.] . . . Biological fatherhood does not, in and of itself, qualify a man for presumed father status under [Family Code] section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection. [Citation.]" (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) "Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]'" (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802, fn. omitted. (*Jerry P.*).) "This court has consistently held that a biological father's rights are limited to establishing his right to presumed father status, and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so. [Citations.]" (*In re A.S.* (2009) 180 Cal.App.4th 351, 362 (*A.S.*).)

Here, the court found father to be an alleged father. He has never been elevated to presumed father status. "An alleged father is entitled to notice so that he may change his paternity status, but he has no standing to challenge other orders." (*In re Alyssa F.*

12

(2003) 112 Cal.App.4th 846, 855.)  Since father has no standing to challenge the court's section 388 order or its order terminating parental rights, this appeal must be dismissed.

### B.  *There Was No Evidence to Support His Claim of Presumed Father Status*

Father concedes that the court made no specific finding that he was a presumed father.  Nonetheless, he claims that he was a presumed father "because substantial evidence supports it."  The record does not support his claim.

"Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]'" (*Jerry P*., *supra*, 95 Cal.App.4th at pp. 801-802.)  One who claims he is entitled to presumed father status has the burden of establishing, by a preponderance of the evidence, the facts supporting that entitlement.  (*In re Spencer W*. (1996) 48 Cal.App.4th 1647, 1653.)  Family Code section 7611 "sets out a number of ways a father can obtain 'presumed father' status.  He can marry or attempt to marry the child's mother, he and the mother can execute a declaration of paternity or he can 'receive[] the child into his home and openly hold[] out the child as his natural child.'" (*Jerry P*., *supra*, 95 Cal.App.4th at p. 802, fns. omitted.)

Here, father asserts that he satisfied the qualifications of being a presumed father because "the uncontroverted evidence in the record shows that he was present at the hospital [at] the time of the child's birth, signed a voluntary declaration of paternity and took the child into his home for six months."  The "evidence in the record" that he cites is his counsel's declaration that was attached to the section 388 petition.  However, there is

no independent evidence in the record, such as a copy of the declaration of paternity, to support any of these claims. Furthermore, his counsel's declaration does not allege that he ever tried to marry mother. (See *Jerry P.*, *supra*, 95 Cal.App.4th at p. 802.) It also does not support a finding that he "receive[d] the child into his home and openly h[eld] out the child as his natural child." (*Ibid.*; see Fam. Code, § 7611, subd. (d).) It states that father "lived with Mother and child for approximately six (6) months." The problem is that, in order to qualify as a presumed father, he had to have received the child into his own home, not merely move into mother's home. (See *In re Sarah C.* (1992) 8 Cal.App.4th 964, 973 (*Sarah C.*).) The declaration further states that, after father and mother terminated their relationship, father had the child in his home every weekend for two years. However, other than his attorney's declaration and his own self-serving claims, there is no evidence that he had the child every weekend for those two years. The declaration then makes the vague assertion that, thereafter, father "would visit [the] child as often as possible and when he would locate mother." It does not say where the visits took place, how long they lasted, or what they did.

In any event, none of father's contentions show that he has demonstrated a full commitment to his parental responsibilities. Again, "[p]resumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]'" (*Jerry P.*, *supra*, 95 Cal.App.4th at pp. 801-802.) Father certainly did not promptly come forward or demonstrate any commitment to his paternal

14

responsibilities. Rather, as the court pointed out, he chose to move to Colorado, away from the child. Moreover, father does not even claim that he attempted to keep in touch with her after he moved. By the time he contacted CFS in April 2015, the child was six years old, and he had not seen her for 14 months. He also has not claimed that he provided any emotional or financial support to the child. (*Ibid.*) In addition, he has provided no evidence that he held out the child as his own. At most, father has merely asserted his desire to have custody of the child.

Father then appears to argue that his presumed father status can be implied. He asserts that the record shows that the parties, as well as the court, treated him as the child's presumed father at the time of the section 388 hearing. He concludes that "the fact that all parties in the court below treated him as a presumed father, *without objection*, prevents any party on appeal from claiming he is otherwise." In support of this claim, he cites *In re Christopher I.* (2003) 106 Cal.App.4th 533. However, that case concerns the standards to apply when deciding whether to withhold or withdraw life-sustaining medical treatment from a child who is a dependent of the court. (*Id.* at p. 548.) Presumed fatherhood status is not an issue in that case.

Finally, father argues that, if this court determines that he is merely an alleged father, we should remand the case to the juvenile court to hold a hearing to determine his fatherhood status. He also contends that, if this court finds that he failed to seek presumed status below, we should reverse the matter because his counsel was ineffective for failing to do so. "The test for ineffective counsel is twofold: (1) counsel's

representation falls below an objective standard of reasonableness and (2) the deficiency subjects defendant to demonstrable prejudice. [Citations.] A court need not evaluate whether counsel's performance was deficient before examining prejudice suffered by defendant. [Citation.] Thus, a court may reject a claim if the party fails to demonstrate that but for trial counsel's failings, the result would have been more favorable to the defendant." (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.) Father fails to demonstrate that the court would have granted his presumed father status had his counsel sought such status below. (See *ante*.) Therefore, we reject his ineffective assistance of counsel claim. For the same reason, we see no need to remand the matter.

C. *The Court Was Not Required to Make a Finding of Parental Unfitness*

Father argues that the court erred in terminating his parental rights without making detriment findings sufficient to establish parental unfitness. However, since father was merely an alleged father, the court was not required to make a finding that he was unfit before terminating his parental rights. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 933-934 (*Jason J.*); *Sarah C.*, *supra*, 8 Cal.App.4th at p. 981.)

We note that father spends a substantial amount of time discussing four cases, including *In re Gladys L.* (2006) 141 Cal.App.4th 845, *In re Frank R.* (2011) 192 Cal.App.4th 532, *In re Z.K.* (2011) 201 Cal.App.4th 51, and *In re T.G.* (2013) 215 Cal.App.4th 1. However, none of these cases pertain to the rights of alleged fathers. As the court in *T.G.* explained, "*Gladys L.*, *Frank R.*, and *Z.K.* teach that a court may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights

16

without finding, by clear and convincing evidence, that awarding custody to the parent would be detrimental." (*T.G.*, at p. 20.)  Furthermore, the father in *T.G.* was declared a presumed father, and he repeatedly sought custody.  (*Id*. at p. 18.)

In the instant case, father was never declared a presumed father, and he never sought custody of the child.  (See *ante*.)  Therefore, no finding of parental unfitness was required.  (*Jason J.*, *supra*, 175 Cal.App.4th at pp. 933-934.)

II.  The Court Properly Denied Father's Petition and Terminated His Parental Rights

Notwithstanding the fact that father was only an alleged father, not entitled to reunification services or custody, he has not shown that granting him services or custody, as requested in the section 388 petition, was in the child's best interest.

In order for the dependency court to grant his petition, father had to show changed circumstances and that the proposed change would promote the best interest of the child.  (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)  On appeal, he merely states that he lived with the child when she was younger, and then visited her, and "was no stranger to her."  He also asserts that he was the "sole natural parent figure in [the child's] life" and that he did not harm her or neglect her, but just failed to stay in contact with her.  The only "evidence" in the record that father ever lived with the child or visited her was his own self-serving statements to the social worker and his counsel's declaration.  Moreover, by father's own admission, the last contact he had with the child was on February 11, 2014, which was over one year prior to the section 366.26 hearing.

17

Significantly, the record does not demonstrate any actual *relationship* between father and the child.

In contrast, the record showed that the child was living in a foster home with her sister and had been there since December 5, 2014. She was very bonded with the foster mother. The foster mother wanted to adopt the child, and the child wanted to stay with her.

Ultimately, the court properly denied father's section 388 petition and terminated father's parental rights, since adoption was in the child's best interests.

<u>DISPOSITION</u>

Father's and mother's appeals are dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST       
Acting P. J.

We concur:

McKINSTER        
        J.

CODRINGTON      
        J.