Filed 4/11/18  Reposted to correct pagination formatting; no changes to opinion text
**CERTIFIED FOR PUBLICATION**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.K., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E068464 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1700110) |
| v. | O P I N I O N |
| R.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Guy B. Pittman, Carole Nunes Fong, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

S.K. was born with methamphetamine in his system and, after defendant and appellant, R.B. (mother), absconded with him, he was hospitalized with toxic levels of oxycodone in his system.  The juvenile court removed S.K. from mother based on her untreated substance abuse.  On appeal, mother challenges the court's finding that the social worker exercised due diligence in conducting an investigation "to identify, locate, and notify" S.K.'s relatives of his removal.  (Welf. & Inst. Code, § 358, subd. (b)(2).)[1] We affirm.

## II.  FACTS AND PROCEDURE

Plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), received a referral in February 2017 alleging newborn S.K. was exhibiting signs of drug withdrawal, but mother refused to allow a toxicology screen.  Hospital staff "bagged" S.K. to obtain a urine sample and left him in a crib at mother's bedside.  The bag was either improperly secured or tampered with and did not produce a sample sufficient to run a toxicology screen.  The medical social worker opined that it was possible but unlikely that the bag was improperly secured.  Mother denied tampering with the bag.  The hospital ordered a meconium drug screen,[2] which results would be available in four to five days.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

[2]  Meconium is "[t]he greenish material which is in the intestine of the fetus.  It consists of the secretions of the intestine and stomach, bile, etc., and it constitutes the first stools of the newborn infant."  (2 Schmidt, Attorneys' Dictionary of Medicine (1992) p. M-53.)

When interviewed at the hospital, mother reported that she was not in a relationship with G.K. (father) and father did not want anything to do with her or S.K. She was living "on and off" at maternal grandmother's home or the home of a close friend. She planned to reside with her close friend upon discharge from the hospital. Mother admitted to using drugs in the past but denied using after learning of her pregnancy. The meconium test was positive for methamphetamine and opiates. DPSS verified that hospital staff had given mother morphine and Norco on the day she went into labor.

After DPSS's initial contact with mother, she disappeared and ceased contact with DPSS. Approximately one month later, in late March 2017, DPSS received another referral alleging S.K. and mother had been transported to the hospital by ambulance. S.K. had suffered a seizure when mother was feeding him. His urine drug screen revealed a toxic level of oxycodone in his system. Hospital staff admitted S.K. to the neonatal intensive care unit. He was "not doing well" and was "in danger of not pulling through this ordeal." He was unable to breathe without assistance and was nonresponsive. Mother denied breastfeeding S.K. and said that she only fed him formula. She could not explain how S.K. got oxycodone in his system. She said she "sporadically" used methamphetamine and used heroin, but never around S.K.

Mother wanted DPSS to contact S.N. about placing S.K. with her. S.N. is the mother of one of father's adult children—that is, one of S.K.'s half siblings. Mother described S.N. as a good friend who had babysat S.K. before. DPSS contacted S.N., who

3

was willing to take placement. S.N. had abused substances in the past and had her own dependency history, but she had been clean and sober since 2002.

Neither mother nor S.N. had contact information for father. DPSS's search of the Jail Information Management System revealed no matches for father.

In April 2017, DPSS filed a petition alleging that (1) S.K. tested positive for methamphetamine and opiates at birth, and approximately a month later, he suffered a seizure and had high levels of oxycodone in his system, (2) mother had an extensive and untreated history of abusing controlled substances, (3) father's whereabouts were unknown and he had failed to provide for S.K., and (4) mother failed to cooperate with preplacement preventative services. (§ 300, subds. (b), (g).)

At the detention hearing in April 2017, the court found a prima facie case that S.K. came within section 300, subdivisions (b) and (g), and detained him from the parents. S.K.'s condition had improved and the hospital was ready to discharge him. Mother was not present, but mother's counsel indicated she was also asking for placement with maternal great-aunt S.B. While mother provided a last name for maternal great-aunt, it was not her married name, and mother was unsure of her married name. Mother told counsel she had given the phone number for maternal great-aunt to the social worker. The court noted: "[DPSS] is obviously obligated to look at any and all reasonable relatives or suitable relatives for placement. So to the extent that . . . [S.B.], unknown married name, was given as a potential relative, [DPSS] will make inquiries and see if that person is available for relative placement." S.K.'s counsel also asked that DPSS

4

look into placement with C.W., who was the paternal grandmother and legal guardian of mother's first child (and thus another one of S.K.'s half siblings). The court ordered DPSS to look into C.W. and ordered mother to disclose the names, addresses, and phone numbers of relatives, to the extent she had that information. The court noted that father's name sounded familiar. Mother's counsel agreed and thought he might be a "possible father on another case." The court ordered DPSS "to look into the father's name."

DPSS placed S.K. in a foster home in early April 2017. It conducted a CWS/CMS database search for maternal great-aunt and C.W., but the search yielded no results.[3] The jurisdictional/dispositional report did not contain a statement from mother because DPSS had been unable to contact her despite multiple attempts. The telephone number mother had provided was disconnected, and DPSS received no response to the messages it left at maternal grandmother's home. Mother did not appear for a scheduled visit with S.K. DPSS had been trying to contact mother, in part to get contact information for maternal great-aunt and C.W. But because it had been unable to reach mother, and because its database search yielded no results, DPSS had not contacted either woman to discuss placement. DPSS had left a message for S.N. and sent her notice of S.K.'s removal.

---

[3] CWS/CMS is the Child Welfare Services Case Management System. (§ 16501.5, subd. (a).) It is a statewide case information system used by child welfare services agencies to manage their cases and provide statewide access to information about children receiving services. (See §§ 16501.5-16501.7.)

5

In the three weeks between the detention and jurisdictional/dispositional hearings, DPSS conducted searches for father in an online directory (www.whitepages.com), the CWS/CMS database, the superior court's databases, the local jails and state prisons databases, and DPSS records to determine whether father had ever received aid at an address in Riverside. It also checked with child support services. Still, it had not located father. The social worker referred the case to the parent locator unit for a further search.

At the jurisdictional/dispositional hearing in April 2017, mother submitted a waiver of rights and the court found the allegations of the petition to be true. As to the placement issue, mother objected that DPSS had not used due diligence to locate possible relatives for placement. Mother denied intentionally losing contact with DPSS. She indicated she had been trying to contact the social worker formerly assigned to the case and finally spoke with the current social worker the day before the hearing. She also indicated she had spoken with maternal great-aunt that morning, and maternal great-aunt said DPSS had not contacted her. The court stated: "So we were doing a search in the computer looking for information for [maternal great-aunt] so we could notify her or contact her. So if you have that person's phone number or address and so forth, turn it over to [DPSS] so that we can give them notice that we are interested in looking at people for placement. Okay?" Mother replied, "Okay." Mother also informed the court and the parties that C.W. was deceased. Later in the hearing, mother again raised the issue of the

6

search for relatives. She said she had given maternal great-aunt's phone number to the prior social worker on the case, even if the current social worker said she did not have any information. The court told mother's counsel: "We need to have your client meet with the social worker or talk to the social worker and give us complete information of everyone that she would like considered so we can do proper consideration. [¶] I'm going forward with the jurisdiction hearing, however, I'll set a further proceeding[] to discuss your contention regarding the court's intended finding of using due diligence by [DPSS]. So I'll leave that finding alone today so I can make it at a later date."

The court ordered S.K. removed from mother's physical custody and granted her reunification services. It also directed: "Mother is ordered by end of business day tomorrow to make contact with the social worker and provide any and all names of relatives or family friends that she would like considered for placement of this child, including their telephone and home address and whatever else information she has and provide it to the social worker by tomorrow, 5:00 p.m." Mother's counsel indicated she would "send her over to [DPSS] today." The court ordered DPSS "to exercise due diligence toward resolving all these issues," and it scheduled a hearing in one month for "further proceedings regarding relative placement." The court further ordered mother to appear at the next hearing. As to father, the court found he was merely an alleged father and his whereabouts were still unknown, and it denied reunification services for him.

That same day, after the jurisdictional/dispositional hearing, DPSS tried to contact mother by phone, but the number was disconnected. It then left a message on maternal grandmother's phone requesting a return call. Six days later, mother contacted DPSS, but she said she needed to call back with relatives' names and addresses because "she was using a friend's phone." Nine days after that, DPSS again tried to contact mother at her last known phone number, which was still disconnected, and again left a message on maternal grandmother's phone.

The further hearing on relative placement took place in June 2017. Mother had not contacted DPSS again as of that hearing date. She was not present at the hearing. Her counsel acknowledged mother had not complied with the court's order to contact the social worker with relative information, but counsel still argued DPSS lacked due diligence in trying to locate relatives. The court found: "The court at this time, based upon the limited information we have gathered from the mother thus far, will make a finding that [DPSS] is actively working towards relative assessments if there are any available. The duty is ongoing. It does not end simply because we had a hearing denying services to one side or offering services or other [*sic*]. [DPSS] must continue to do so."[4] DPSS was waiting for S.N. to return its call, and the court ordered DPSS to continue its efforts to assess her for placement. It also asked DPSS if it had "figure[d] out who the child was that [father] fathered on the other dependency cases so we can look in those

---

**4** Although the court did not expressly use the term "due diligence," we construe its comments as an implied finding of due diligence. On appeal, the parties do not dispute that the court made a due diligence finding.

8

files." DPSS replied that it had not yet, but would do so that afternoon. The court directed DPSS to "keep every report filled with information about what we have done to pursue relative placement."

### III. DISCUSSION

Mother contends the court erred when it found DPSS exercised due diligence in trying to locate relatives for placement of S.K. We disagree.

A. *Standard of Review*

Mother does not identify which standard of review we should apply to the court's finding of due diligence. We review a juvenile court's placement decisions for abuse of discretion (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420), and DPSS asserts we should likewise review the due diligence determination for abuse of discretion because it involves relative placement issues.

A placement decision is fundamentally about what is best for the child, and we routinely apply the abuse of discretion standard to decisions in this vein. (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2017) § 2.190[14][c], p. 2-684 ["A reviewing court employs the abuse of discretion standard in many instances where the trial court exercises its discretion in determining what is best for the dependent child . . . ."].) By contrast, whether DPSS has diligently searched for relatives is not a determination about what is best for the child. The two types of decisions are not so analogous that the standard of review for one should necessarily apply to the other.

9

The due diligence question is primarily a factual matter that considers DPSS's reported efforts, and we should therefore review the court's determination for substantial evidence. In a more analogous situation, one reviewing court applied the substantial evidence standard to the juvenile court's conclusion that the county exercised due diligence in trying to locate a parent to give him notice of the dependency proceeding. (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 973-974.) This is also the standard applied to the court's determination of whether a county has provided reasonable reunification services to a parent. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) The due diligence finding is more akin to a finding of reasonable reunification services than a placement decision. Accordingly, we examine the whole record and ask whether any substantial evidence, contradicted or uncontradicted, supports the court's finding, indulging all reasonable inferences in support of it. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545; *In re Amy M.* (1991) 232 Cal.App.3d 849, 859-860.) But were we to review the finding under the more deferential abuse of discretion standard advanced by DPSS, our result would be the same.

B. *Substantial Evidence Supported the Court's Due Diligence Finding*

When DPSS initially removes a child, within 30 days the social worker must conduct an investigation to identify and locate adult relatives of the child. (§ 309, subd. (e)(1).) The social worker must use due diligence in this investigation. (§ 309, subd. (e)(3).) "Adult relatives" means "all grandparents, parents of a sibling of the child, if the parent has legal custody of the sibling, adult siblings, . . . other adult relatives suggested

10

by the parents," and other adults who are "related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons." (§§ 309, subd. (e)(1), 319, subd. (f)(2).) DPSS must give any adult relatives that it locates notice of the child's removal and an explanation of the options to participate in the care and placement of the child. (§ 309, subd. (e)(1)(A), (B).)

Later, if the court removes the child from the parents' custody at the disposition hearing, it "shall make a finding as to whether the social worker has exercised due diligence in conducting the investigation . . . to identify, locate, and notify the child's relatives." (§ 358, subd. (b)(2); accord, Cal. Rules of Court, rule 5.695(e)(1).) The court may consider, among other things, whether the social worker has (1) asked the child in an age-appropriate manner about his or her relatives, (2) obtained information about the location of relatives, (3) reviewed the case file for any information regarding relatives, (4) contacted all identified relatives, (5) asked located relatives for the names and locations of others, and (6) used online search tools. (§ 358, subd. (b)(3); Cal. Rules of Court, rule 5.695(f).)

The court shall order the parents to disclose to the social worker the names, addresses, and any other known identifying information of relatives. (§ 361.3, subd. (a)(8)(B).) Thus, "[t]hroughout the dependency process, the responsibility for identifying

11

potential relative placements is shared by all participants." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.127[3], p. 2-434.)

When the court finds the social worker has not used due diligence, "the court may order the social worker to exercise due diligence in conducting an investigation to identify, locate, and notify the child's relatives . . . and may require a written or oral report to the court." (Cal. Rules of Court, rule 5.695(e)(2).) But the investigation of relatives "shall not be construed as good cause for continuance of the dispositional hearing." (§ 361.3, subd. (a)(8)(B).)

Here, substantial evidence supported the court's finding of due diligence. Mother objects to that finding for two principal reasons—DPSS relied only on mother to obtain contact information for maternal great-aunt, and it did not search its records for father's other dependency case so that it could locate paternal relatives. As to maternal great-aunt, mother said she knew her phone number and had given it to the previous social worker. The court ordered mother several times to disclose all known contact information for relatives. It specifically told her to turn over maternal great-aunt's phone number again. For whatever reason, the current social worker did not have it. Mother suggests DPSS was not diligent because there is no evidence the current social worker asked the previous one for the phone number. But mother shared the responsibility for helping to identify relatives, and knowing the information, it was easy enough for her to simply provide the phone number again. For several weeks after the jurisdictional/dispositional hearing, the social worker diligently pursued mother at her

12

known phone number and maternal grandmother's phone number, even though the court ordered mother to contact DPSS no later than the day after the hearing. When the social worker finally got her on the phone, she inexplicably said she had to call back because she was on a friend's phone, and then never did. Mother's own conduct held back the investigation. Under these circumstances, where mother has the information, DPSS diligently pursues mother, and mother is not complying with court orders to cooperate with DPSS, substantial evidence supported the finding of the juvenile court that DPSS exercised due diligence. This is particularly true where mother did not provide DPSS with maternal great-aunt's correct last name, which undeniably limited its ability to search for her.

As to father, the record supports the conclusion that DPSS was diligently trying to locate him and thus his relatives. He was the only avenue available to obtain information about his relatives. Mother faults DPSS for admitting at the last hearing that it had not yet looked into father's "other dependency cases." Although counsel for DPSS declared this, the record shows otherwise. The social worker searched multiple databases for father, including the CWS/CMS database, the statewide database child welfare services agencies use to manage their cases and provide statewide access to information about children receiving services. (See §§ 16501.5-16501.7.) The search returned no results for father. Mother operates as if he definitely had a dependency case for another child, but the court only thought his name sounded familiar, which was no confirmation that

13

such a case existed.  Thus, substantial evidence supported the conclusion that DPSS was diligently trying to locate father.  In sum, the court did not err.

## IV.  DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

FIELDS
                                                                    J.

We concur:

RAMIREZ
                P. J.

CODRINGTON
                J.