Filed 2/17/22  In re C.Z. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C.Z., a Person Coming Under the Juvenile Court Law. | |
| | D079117 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519844) |
| v. | |
| A.Z., et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Appellants, W.R. and L.R.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant, A.Z.

Emily Uhre, under appointment by the Court of Appeal, for

Defendant and Appellant, L.B.

Terence M. Chucas, under appointment by the Court of Appeal, for Minor, C.Z.

Lonnie J. Eldrige, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Senior Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

A.Z. (Father), L.B. (Mother), and W.R. and L.R. (collectively, the Relatives) appeal orders denying the Relatives' petition to change minor C.Z.'s placement, terminating parents' parental rights, and selecting a permanent plan of adoption for C.Z. They generally contend that the trial court erred in failing to apply the statutory preferential consideration of relatives for placement pursuant to Welfare and Institutions Code section 361.3.[1] The Relatives contend that their due process rights were violated because they were not provided with proper notice of their right to seek placement at an earlier point in this proceeding. They contend that for these reasons, the juvenile court's orders must be reversed.

Appellants have failed to establish any reversible error. Although the Relatives should have received written notice early in the proceeding and did not, the proper remedy for a failure to provide notice would be a hearing before the juvenile court to consider a change in placement under the factors set forth in section 361.3. In this case, after the Relatives specifically requested such a hearing, the juvenile court conducted a hearing, applying the section 361.3 factors, and declined to change C.Z.'s placement, finding

_____

[1]     All further statutory references are to the Welfare and Institutions Code.

2

that remaining in her current placement with her de facto parents was in her best interests. The juvenile court did not abuse its discretion in reaching this conclusion. The juvenile court reasonably weighed the evidence under the proper standards and we see no basis to second guess the court's judgment. Accordingly, we affirm the orders.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2018, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court pursuant to section 300, subdivision (b), on behalf of newborn C.Z. The Agency alleged that when C.Z. was born, both she and Mother tested positive for amphetamine and/or methamphetamine. Mother admitted to using methamphetamine and unprescribed pain medications during her pregnancy; Father also had known substance abuse issues. The Agency further alleged that Father was aware of Mother's drug use during the pregnancy and failed to protect C.Z.

C.Z. experienced withdrawal symptoms after birth and was placed in the Neonatal Intensive Care Unit (NICU). The parents were homeless and the Agency noted that they were also experiencing withdrawal symptoms and appeared unable to remain alert. On this basis, the Agency recommended that C.Z. be detained in out-of-home care.

The juvenile court found that the Agency had made an adequate showing that C.Z. was a person described by section 300, subdivision (b), and ordered her detained in out-of-home care.

In its jurisdiction report, the Agency explained that C.Z. was placed in the home of J.C. and D.C., her current caregivers, eight days after her birth.[2]

_____

[2] To avoid confusion with initialed names, we will refer to J.C. and D.C. as the "current caregivers."

The Agency inquired about relative placement, but both Mother and Father had no relatives in San Diego. A social worker spoke with the maternal grandmother, who resides in Minnesota. She told the social worker that she and her husband were not interested in placement. Father informed the social worker that he had out-of-state relatives who might be interested in placement and said that he would discuss the issue of placement with his family.

In October 2018, Father provided the social worker with the contact information for relatives who might be able to care for C.Z. including his cousin L.R. and her husband, B.R., who we refer to as the "Relatives." The Relatives reside in Philadelphia, Pennsylvania.

The social worker sent written notification regarding placement pursuant to section 309 to the maternal and paternal grandparents in October, but did not send notification to the Relatives. That same month, the paternal grandmother responded that she was not interested in placement.

In November, the social worker called L.R. The social worker's notes indicate that L.R. expressed an interest in placement only if C.Z. was not already placed in "a loving home." At a subsequent hearing, L.R. testified that the social worker told her during that initial conversation that C.Z. could be placed with the Relatives only if reunification failed, but L.R. also confirmed that the Relatives were interested in placement "only if [Father] failed to reunify." The social worker's case notes from late 2018 state that the Relatives informed the Agency that they wanted placement "if parents are unable to reunify." The social worker and L.R. agreed to speak again in three months to check on the parents' progress with reunification and, if reunification appeared unlikely, to begin the placement process. The social worker's case notes memorializing this conversation state that the Agency

4

should have the Relatives' home evaluated for placement "[i]n a few months, if parents are not making progress on their case plan."

At C.Z.'s jurisdiction and disposition hearing in December 2018, the court sustained the allegations of the petition under section 300, subdivision (b). The court placed C.Z. in a foster home with her current caregivers and ordered reunification services for both parents.

In advance of the six-month review hearing, the Agency reported that both parent's participation in reunification services was inconsistent, but recommended that the juvenile court continue services for another six months. The court agreed and continued reunification services to the 12-month review hearing. Before that hearing, the Agency noted that the parents had made "significant progress" and believed it was likely that C.Z. would reunify with parents "in the near future." The court agreed and ordered reunification services to continue.

However, the parents' efforts at reunification began to falter after the 12-month hearing. In January 2020, both Mother and Father tested positive for controlled substances and stopped participating in services. In a report, the Agency recommended that the court terminate reunification services and set the matter for a selection and implementation hearing pursuant to section 366.26. By April 2020, Mother continued to test positive for controlled substances, Father had repeatedly failed to appear for drug tests, and neither had requested any visits with C.Z.

That same month, the juvenile court ordered the Agency to begin the interstate process to evaluate the Relatives and their home for placement. By the time of the 18-month review hearing, that review process was still pending. At that same hearing, held in October 2020, the juvenile court

terminated reunification services and set the matter for a selection and implementation hearing pursuant to section 366.26.

The Relatives were approved for placement by a Pennsylvania agency the following month. L.R. told a social worker that she had wanted to ensure that reunification could take place, but was now interested in placement of C.Z. with the Relatives. Both parents stated that they wanted C.Z. placed with the Relatives.

Before the section 366.26 hearing, the Relatives filed a petition pursuant to section 388 to change C.Z.'s placement. The juvenile court ordered a hearing on the section 388 petition to coincide with the section 366.26 hearing.

In its initial section 366.26 assessment report, the Agency recommended that the court deny the Relatives' petition, terminate parental rights, and find C.Z. to be adoptable. The Agency reported that C.Z.'s pediatrician opined that C.Z. was in excellent health and that it would be detrimental for her to be removed from her current family. Similarly, a therapist who worked with C.Z. to address her separation anxiety told the Agency that a significant transition would be very difficult for C.Z. C.Z. had been with her current foster family since she left the hospital after her birth and that family was committed to adopting her. C.Z.'s maternal grandmother told the Agency that she believed that C.Z. should remain in her current placement.

Regarding the Relatives' petition, the Agency noted the value of placing a child with relatives, but stated that there were "significant concerns" with changing C.Z.'s placement that outweighed the benefits of placing her with the Relatives. The Agency indicated that if C.Z. were moved, "she will have significant trauma that will likely result in loss of her developmental gains as

6

well as possible inability to attach to another caregiver." The Agency further explained that while both placement options would provide safe and stable homes, the concerns regarding changing the placement and severing C.Z.'s relationship with her current caregivers weighed against any change.

In an addendum report, the Agency detailed C.Z.'s adverse reaction to visits with the Relatives. The Agency explained that C.Z.'s "struggles with severe anxiety" were affecting her ability to be apart from her current caregivers and bond with the Relatives. In its final addendum report, the Agency again recommended that the Relatives' section 388 petition be denied, that parental rights be terminated, and that the juvenile court order a permanent plan of adoption.

At a multi-day trial, the juvenile court first considered the Relatives' section 388 petition to change C.Z.'s placement. The social worker assigned to the case testified that in her conversations with the Relatives throughout the case, they repeatedly expressed an interest in placement only if the parents' reunification efforts failed. She also testified that the current caregivers had developed a strong relationship with C.Z. and were very attuned to her needs. The social worker believed that visits with the Relatives were stressful for C.Z. and that she was not progressing in therapy as would be expected for a child her age. The social worker noted that, compared to other children, C.Z. had greater difficulty forming relationships with new people and that when she was removed from the presence of her current caregivers, she often behaved in a way that led the social worker to conclude that C.Z. was experiencing significant stress.

C.Z.'s therapist testified that C.Z. was consistently displaying symptoms of anxiety, and that these symptoms increased following some of the visits with the Relatives. The therapist explained that C.Z.'s anxiety was

related to her concern about being separated from her current caregivers. In response to specific questions on cross-examination, the therapist agreed that children may pick up on their caregivers' anxiety and that C.Z.'s current caregivers had expressed their own concerns regarding a possible change in C.Z.'s placement. However, the therapist later clarified that she did not believe that the current caregivers were causing C.Z.'s anxiety. She explained that C.Z. had an "anxious attachment," style, which could be improved by consistency and stability in her relationships. According to the therapist, C.Z. might have formed her attachment issues at birth, when she was separated from her biological mother and placed in the NICU. The therapist would not opine as to the better placement for C.Z., but warned that any change in placement was likely to cause significant distress to C.Z.

A forensic psychologist testified that he performed an assessment of C.Z.'s current caregivers and their relationship with C.Z. Based on that assessment, he concluded that C.Z. had a very strong bond with her current caregivers and one of the foster siblings, who was present for the assessment. He opined that disrupting those bonds by moving C.Z. from the only family she had ever lived with would be "very devastating." He explained that "it would create heightened anxiety, distress, difficulty in further attachment or bonding" and "could be an issue that affects this child for years to come."

C.Z.'s maternal grandmother testified that she had a very healthy relationship with the current caregivers. During visits with the current caregivers, the grandmother observed that C.Z. considers them to be her mother and father. She believed that C.Z. should remain in her current placement and not be moved to the Relatives' home.

C.Z.'s foster father testified that C.Z. had lived in their home for almost three years, since she was nine days old. He explained that C.Z. had bonded

8

with his three biological children. The current caregivers were committed to maintaining the relationships between C.Z. and her biological family.

Following the conclusion of testimony and argument from counsel regarding the section 388 petition, the parties proceeded to argument on the section 366.26 hearing, which proceeded on the basis of documentary evidence, with no live testimony.

In its ruling, the juvenile court acknowledged that it was required to evaluate the Relatives' section 388 petition under the factors set forth in section 361.3 and said that it had considered the evidence as applied to those factors in reaching its decision.

The court acknowledged that it would be selecting between two good options for C.Z.'s placement and that each home was appropriate for C.Z. The court stated, "[t]here's nothing before the court that any one home is better than the other. They are obviously of equal value in that regard." The court noted the evidence regarding C.Z.'s issues with anxiety and her special needs, which it attributed to the circumstances of her birth, in that she was born addicted to drugs and had undergone severe withdrawal symptoms in her first days.

The court acknowledged that the Relatives' minimal relationship with C.Z. was due in part to the Agency's "muddled" communications with the Relatives regarding placement and the failure to clarify their interest in placement. Considering the other section 361.3 factors, the juvenile court found that the Relatives could provide a safe home and secure environment for C.Z., would be able to facilitate the case plan, and had the ability to meet all of C.Z.'s needs. The court also found the Relatives to be of sound moral character. Finally, the court noted the biological parents' interest in having C.Z. placed with the Relatives.

9

In the end, the court concluded that because it was presented with two good options, its decision would be based on a determination as to which placement was in C.Z.'s best interests. The court recognized the passage of time since C.Z.'s placement with her current caregivers and that maintaining that relationship was important to ensure that C.Z. was provided with continuity and stability.

The court concluded that C.Z. "is in a home where she has lived since she was nine days old, where she has thrived. And while the court is mindful of the preference for relative placement, it is also mindful of the need to provide dependent children with stability and permanency. And therefore, in the analysis of all the evidence and law before this court, I find the successful bonding of [C.Z.] to her de facto parents measured against the request for placement and the uncertainty associated with how she would respond to being removed from the only secure setting she has known since birth; that moving her from her current home is not in her best interest." Accordingly, the juvenile court denied the Relatives' request in their section 388 petition to change C.Z.'s placement.

Turning to the section 366.26 issues, the court found that C.Z. was both generally and specifically adoptable and that none of the exceptions to adoption applied. The court terminated parental rights and selected adoption as C.Z.'s permanent plan.

Both the parents and the Relatives appealed the court's decision.

### III.

### DISCUSSION

On appeal, the Relatives contend that the juvenile court erred in denying their section 388 petition to change C.Z.'s placement. Mother and

10

Father do not offer their own arguments on appeal, but rather, join in the Relatives' arguments.[3]

A.    *The Relatives Were Not Denied Due Process*

As framed by the Relatives, "[t]he question presented in this case is whether the [R]elatives were given due process notice of their right to request placement of their relative minor prior to the termination of reunification services."  In their briefing, they focus on a procedural due process claim based on their right to notice under section 309 of their purported right to placement at the beginning of the dependency proceeding.

"The procedural component of the due process clause ensures a fair adjudicatory process before a person is deprived of life, liberty, or property.  [Citations.]  Not every denial of a fair hearing for which a remedy may be available under state law implicates constitutional due process.  [Citation.]  'The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.'  [Citation.]  The range of interests protected by procedural due

---

3    The Agency asserts that the parents lack standing to challenge the juvenile court's order regarding relative placement and that we should dismiss their appeals.  In making this argument, the Agency relies primarily on a Supreme Court decision, *In re K.C.* (2011) 52 Cal.4th 231 (*K.C.*), which is distinguishable.  In that case, our Supreme Court held that a father lacked standing to appeal from an order regarding relative placement immediately preceding the termination of parental rights when the father (1) acquiesced in the termination of parental rights, and (2) there was no other appeal of the order regarding relative placement.  (*Id.* at pp. 238-239.)  In this case, Father did *not* acquiesce in the termination of parental rights and the Relatives have independently appealed from the order.  Accordingly, the parents may participate in this appeal, even if only in "a status loosely akin to that of amicus curiae."  (*Id.* at p. 239.)  In any event, parents simply join in the arguments made by the Relatives.

11

process is limited. " (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 852.)

As the Agency notes, courts have consistently held that non-parental relatives have no due process rights in dependency proceedings because they have no liberty interest in association with their minor relatives.  (See, e.g., *Miller v. California Dep't. of Soc. Servs.* (2004) 355 F.3d 1172, 1175-1176; *In re H.K.* (2013) 217 Cal.App.4th 1422, 1435; *In re R.J.* (2008) 164 Cal.App.4th 219, 225.)  The Relatives cite no authority holding that a non-parental relative has any procedural due process rights in juvenile dependency proceedings, and we see no basis on which to establish a constitutional right to notice for non-party relatives.

At most, the Relatives properly rely on their *statutory* right, set forth in section 309, to written notice regarding placement.  Pursuant to section 309, when a child is removed from a parent's custody, the Agency has a duty to conduct an investigation to locate relatives of the minor.  (*Id.* at subd. (e)(1).) Within 30 days of removal, the Agency is tasked with providing *written* notification of the minor's removal and an explanation of the various options for participating in the care and placement of the child to close relatives and relatives suggested by the parents.  (*Ibid.*)

The Agency concedes that the Relatives, who were specifically suggested for potential placement by Father, were not provided with the written notification required under section 309, subdivision (e)(1).  However, the Agency correctly argues that section 309 provides no remedy to a relative for a failure to provide such notice.  At most, the juvenile court may find that the Agency has not been diligent in locating relatives or providing notice and require additional efforts and a report to the court.  (Cal. Rules of Court, rule 5.695(e); *In re S.K.* (2018) 22 Cal.App.5th 29, 38.)

The Relatives did not seek a court finding regarding the Agency's diligence and do not base any claim to relief on California Rules of Court, rule 5.695. Instead, they maintain that the Agency's failure to provide proper notice requires reversal and a new hearing "on whether the relatives should be considered quasi-familial with the protections accorded parents under the Constitution." The Relatives offer no authority to support this claim.

The Relatives rely heavily on *In re R.T.* (2015) 232 Cal.App.4th 1284 (*R.T.*), in which the appellate court concluded that the social services agency failed to provide proper notice pursuant to section 309 and failed to properly consider relatives for placement of a minor. (*Id.* at pp. 1295-1299.) As in this case, the relatives filed a section 388 petition requesting that the court modify the minor's placement. The juvenile court denied the motion after declining to apply the factors set forth in section 361.3 requiring preferential consideration for relative placement. (*Id.* at pp. 1299-1300.) On appeal, the court held that the failure to provide proper notice and the failure to apply the correct standard required reversal. (*Id.* at p. 1308.) However, the court concluded that the proper remedy for a violation of the notice provisions of section 309 was a remand to allow the Agency to consider the relatives for placement and for a new hearing, at which the juvenile court would apply the correct standards under section 361.3. (*Id.* at pp.1299-1300.)

The Court of Appeal in *R.T.* recognized the limits of the available relief, explaining that "effective redress may not be possible given the passage of time spent with other caretakers and the child's current best interest." (*R.T.*, *supra*, 232 Cal.App.4th at p. 1292.) The court explained that on remand, the juvenile court must consider the child's best interest "at this point," which "may well differ from what would have been his best interests when he was still an infant. The passage of time may have strengthened R.T.'s bonds with

13

his caretakers and other circumstances may have developed that bear on an evaluation of his best interest. Meaningful redress for past mistakes may not be possible, but we cannot unwind the clock." (*Id.* at p. 1308.)

Similarly, in *In re Isabella G.* (2016) 246 Cal.App.4th 708 (*Isabella G.*), this court held that the proper remedy for a juvenile court's failure to consider relatives for placement was a remand to consider the relatives' request for placement pursuant to section 361.3. (*Id.* at pp. 724-725.)

In this case, the juvenile court has already provided the Relatives with a hearing to consider their request for placement and, as we will discuss, properly applied the section 361.3 factors. Thus, the Relatives have already been provided the relief to which they would be entitled under *R.T.*, *supra* 232 Cal.App.4th 1284.

In arguing that they are entitled to a new hearing, the Relatives effectively ask this court to "unwind the clock" to allow them to seek placement as if it were the beginning of this dependency proceeding, before C.Z. was placed with her current caregivers and had spent nearly three years in their care. The Relatives speculate that if they had requested that C.Z. be placed with them earlier in the proceeding, the court would have granted that request and they would have developed the bonds with C.Z. to support their interest in permanent placement. Such speculation, however, is not a valid basis for relief. Although the Relatives' frustration is understandable, they seek relief that this court cannot provide. At most, they were entitled to a hearing pursuant to section 361.3 to consider their request for placement. Because they have already been provided with such a hearing, they fail to establish any prejudicial error premised on the Agency's failure to provide the proper written notice pursuant to section 309.

14

Moreover, the record does not establish that the Agency erred in failing to consider the Relatives for placement before the parents' reunification services were terminated. Instead, the record establishes that the Relatives, who live out of state, informed the Agency that they were not interested in immediate placement because they wanted to give the parents the opportunity to reunify with C.Z.

When a social worker first contacted the Relatives, the social worker noted that they stated they were interested in placement *only* if C.Z. was not already placed in a "loving home." L.R. later testified that the social worker told her that C.Z. could not be placed with the Relatives while the parents were receiving reunification services, but also confirmed that she was interested in placement "only if [Father] failed to reunify." In an e-mail sent in March 2019, L.R. acknowledged that Father had identified the Relatives "as a potential 'plan B' if [parents] are unable to reunify with [C.Z.]" L.R. further acknowledged that she agreed with the social worker's suggestion to allow the parents time to work toward reunification. By June 2019, L.R. stated in another e-mail that she hoped that the parents would be able to reunify and asked whether she should take any steps "to prepare in the event they are unable to reunify."

Later, in a conversation with a newly assigned social worker in November 2020, the Relatives reiterated that "they told the Agency they would take [C.Z.] if she needed somewhere to go and that [L.R.] wanted to ensure reunification could take place as this was the plan. [L.R.] stated that should [C.Z.] not reunify she wanted to adopt her and keep her in the family."

The evidence thus establishes that the Relatives did not request that C.Z. be placed with them during the reunification period, likely because an out-of-state placement with the Relatives would have made it impracticable,

15

if not impossible, for the parents to continue their visits with C.Z. and thus, could have significantly diminished the parents' chances for reunification. If the Relatives had expressly requested placement early in this proceeding, it is reasonably likely that the court would have denied the request on the basis that placing C.Z. with the Relatives, who lived out of state, would interfere with the parents' visitation. (See, e.g., *In re Luke L.* (1996) 44 Cal.App.4th 670, 680 [placing minor with out-of-state relatives while reunification is still possible constitutes an abuse of discretion].)

Indeed, at one hearing, Father's counsel acknowledged that he always advises his clients that when they are in the reunification period, "we can't let this child go out of state [because] you know visitation is the most critical point to reunification." This recognition by Father's counsel that an out-of-state placement would have been detrimental to Father's potential reunification further demonstrates that regardless of any notice, placement with the Relatives was not a likely option until after reunification services were terminated.

Further, as noted, the record establishes that even if the Agency had provided the proper written notice pursuant to section 309, the Relatives were not interested in placement while reunification efforts were ongoing. In addition, the parties would have likely opposed placement with the Relatives until after reunification services were terminated. By that time, the process was underway to formally consider the Relatives for placement.

The need to ensure that the parents were provided a meaningful opportunity for reunification was in direct conflict with any interest by the out-of-state Relatives in placement. Although the passage of time between C.Z.'s original detention shortly after birth and the Relatives' request for placement following the termination of reunification services ultimately

16

made it more difficult for the Relatives to establish that it would be in C.Z.'s best interests to be placed with them, the record does not disclose any procedural error by the Agency or the juvenile court that warrants reversal.

We conclude that there was no procedural error, under either California statutes or the due process clause, that would warrant reversal. At most, the Relatives were entitled to a hearing at which the juvenile court applied the factors set forth in section 361.3 to consider their request for placement, and they have already been provided with such a hearing. As a result, on appeal, they are limited to challenging the court's exercise of discretion in denying their request for placement.

B. *The Juvenile Court Did Not Abuse its Discretion in Denying the Relatives' Request for a Change of Placement*

The Relatives contend that the juvenile court abused its discretion in finding that it was in C.Z.'s best interests to remain in her current placement. They categorically declare that "[i]t is best for [C.Z.] to be raised by relatives." (Capitalization omitted.)

All parties agree that the preferential consideration for relatives established in section 361.3 governed the juvenile court's consideration of the Relatives' request for placement.[4] "Section 361.3 gives 'preferential consideration' to a relative request for placement, which means 'that the relative seeking placement shall be the first placement to be considered and

_____

[4]     Although the Relatives styled their request as a section 388 petition, we clarified in *Isabella G.* that a request for relative placement in this context should not be considered under the typical section 388 analysis. (*Isabella G.*, *supra*, 246 Cal.App.4th at pp. 722-723.) Here, the juvenile court did not apply the typical section 388 analysis and instead correctly considered the Relatives' request pursuant to section 361.3.

17

investigated.' (§ 361.3, subd. (c)(1).)" (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 (*Cesar V.*).) Section 361.3 expresses an intent "that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 (*Stephanie M.*).)

Section 361.3 sets forth several factors that the court must consider when evaluating a relative for placement during a dependency proceeding. Those factors, not all of which are relevant here, include consideration of (1) the best interest of the child, including any special needs; (2) the wishes of the parents; (3) the good moral character of the relative; (4) the nature and duration of the relationship between the relative and the child; (5) the ability of the relative to provide a safe, secure, and stable environment for the child; (6) the relative's ability to care for the child; and (7) the relative's ability to provide legal permanence for the child, if necessary. (§ 361.3, subd. (a).)

The evaluation of these factors and the preferential consideration for relatives is expressly *not* an evidentiary presumption that placement with a relative is in a child's best interest. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 320.) Pursuant to section 361.3, "the court is not to presume that a child should be placed with a relative, but is to determine whether such a placement is *appropriate*, taking into account the suitability of the relative's home and the best interest of the child." (*Id.* at p. 321.) Thus, "regardless of the relative placement preference, the fundamental duty of the court is to assure the best interest of the child, whose bond with a foster parent may require that placement with a relative be rejected." (*Ibid.*)

On appeal, the Relatives contend that the juvenile court misapplied section 361.3 by comparing placement with the Relatives to placement with the current caregivers. The Relatives argue that the statutory factors should

18

not be applied to non-relative caretakers. In essence, they suggest that the court should have ignored C.Z.'s current circumstances when evaluating the Relatives for placement.

The Relatives misinterpret the juvenile court's analysis and demand an analysis that would preclude the court from considering C.Z.'s best interests. As our Supreme Court explained in *Stephanie M.*, section 361.3 provides relatives with preferential consideration, but the juvenile court is always tasked with determining whether a change of placement at the time of the hearing is in the best interest of the child. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 322.) The Court recognized that this analysis could not occur in a vacuum and necessarily required consideration of the child's current placement and whether changing that placement would harm the child by disrupting a bond with the current caregivers. (*Id.* at p. 321 ["[I]t was the considered judgment of the juvenile court that a change of placement was not in the child's best interest, in view of her fragile emotional state and her successful and enduring bond with the foster parents. We see no abuse of discretion or misapplication of the statute in this conclusion."].) In this case, the juvenile court's comparing the Relatives to the current caregivers did not improperly undermine the preferential consideration of the Relatives. Instead, the court was evaluating C.Z.'s current status to determine, under the factors set forth in section 361.3, whether a change in placement was in her best interests. We see no error in this regard.

Thus, we are left with determining whether the juvenile court abused its discretion when it evaluated the evidence, considered the factors set forth in section 361.3, and denied the Relatives' request for a change in placement. The parties all agree that we apply the abuse of discretion standard of review in making this determination. (*In re Robert L.* (1993) 21 Cal.App.4th 1057,

19

1067.)  A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.' [Citations.]" (*Id.* at p. 1066.)  Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citations.]" (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)  Thus, although the abuse of discretion standard is deferential, "it is not empty." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)  The standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts.  [Citations.]" (*Ibid.*)

Based on the record before us, we conclude that the juvenile court's decision was not capricious or arbitrary and was within the bounds of reason. As an initial matter, the juvenile court proceeded under the proper legal framework, considering the Relatives' petition by applying the section 361.3 factors.  Applying those factors, the court found that the Relatives were of sound moral character, the parents preferred that C.Z. be placed with the Relatives, and that the Relatives could provide a safe and stable home for C.Z.

However, in the end, the court concluded that it must focus on whether changing C.Z.'s placement was in her best interests.  The court concluded that it was in C.Z.'s best interests to remain in her current placement, and this conclusion is supported by the evidence.  A social worker testified that C.Z.'s current caregivers had a strong relationship with C.Z. and were able to address her needs.  The social worker also noted C.Z.'s special needs and how her anxiety caused her to experience stress if separated from her current

caregivers. C.Z.'s therapist similarly testified that changing C.Z.'s placement could cause significant distress. This concern was echoed by a psychologist, who testified that C.Z. was strongly bonded with her foster family and that severing that bond would be "very devastating" for C.Z.

On appeal, the Relatives focus on evidence adduced at trial suggesting that the current caregivers may be the source of C.Z.'s anxiety and that the benefits of being placed with relatives outweighs any short-term distress to C.Z. that a change in placement might cause. Even if we were to credit this evidence, the Relatives' argument is in direct conflict with this court's limited role in reviewing the juvenile court's decision. Under the abuse of discretion standard, we do not reweigh the evidence or substitute our judgment for that of the trial court. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) No party disputes that the juvenile court was presented with a difficult decision and, absent a showing that the court acted unreasonably, we will not second guess the court's judgment. Accordingly, we conclude that there is no basis for reversing the court's orders.

## IV.

## DISPOSITION

The orders are affirmed.

AARON, Acting P. J.

WE CONCUR:


DATO, J.


GUERRERO, J.