Filed 8/14/25  In re J.P. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | B340700 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.C.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 24CCJP01339 |

APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Dismissed as moot in part and affirmed.

Laura D. Pedicini, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's findings and orders made at the July 15, 2024 combined jurisdiction/disposition hearing. Mother contends: (1) substantial evidence does not support the juvenile court's findings as to one of the three counts on which it declared her son J.P. a dependent —that mother had certain mental health diagnoses and her mental health issues posed a serious risk of harm to J.P.; (2) the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court failed to comply with their duties of initial inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA), and the California statutes implementing ICWA (Welf. & Inst. Code, § 224 et seq.) (Cal-ICWA);[1] and (3) DCFS failed to exercise due diligence to investigate, locate, and contact J.P.'s available relatives (family finding investigation), and the juvenile court failed to make an express finding as to whether DCFS exercised due diligence. We dismiss as moot mother's jurisdictional and ICWA challenges. We conclude mother has forfeited her challenge to DCFS's family finding investigation and the court's implied due diligence finding. We therefore affirm the court's orders.

## BACKGROUND

### 1. *Events leading to petition*

On April 30, 2024, DCFS filed a petition under section 300 subdivisions (a) (serious physical harm) and (b) (failure to protect) alleging mother's and father's son J.P. (born August

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "[W]e use the term 'Indian' throughout to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).) We intend no disrespect.

2023) was at substantial risk of harm due to: his parents' history of domestic violence (counts a-1 and b-1); mother's "mental and emotional problems, including a diagnosis of schizophrenia, bi-polar, multiple personality disorder, anxiety, and depression" (count b-2); and parents' having maintained a dirty home with safety hazards (count b-3).[2]

DCFS became involved after receiving a report of child abuse. According to father, mother had struck J.P. on his hand with a comb and with her hand. Mother hit father when he intervened, scratching him. She was arrested on March 20, 2024 for domestic violence. Father was concerned for J.P.'s safety because mother had "a tendency to use physical punishment when she is upset."

Later, on April 3, 2024, father explained to a social worker that he saw mother hit J.P. on the hand with the comb when J.P. started crying while mother was combing his hair. Father grabbed the baby from mother. Father stated his mother, sister, and aunt all had seen mother strike J.P. They lived in the home with father, mother, and J.P. After mother's arrest, father let maternal great-aunt Tracie keep J.P. with her for a few days, but she hadn't brought the baby back. Father believed mother —who had been released on bail—was with J.P. at Tracie's.

Father told the social worker mother had a seizure disorder and "a history of mental health." She had been prescribed

---

[2]     The juvenile court dismissed count b-3. Father is not a party to this appeal, and mother does not challenge the a-1 and b-1 counts. We thus discuss the facts relating to father and the sustained domestic violence allegations only to the extent they are relevant to mother's appeal.

medication for the seizures.  Father said mother had experienced psychiatric hospitalizations as a child.

The social worker also interviewed paternal great-aunt M.H.[3] who said she had seen mother strike J.P. with a comb. M.H. said mother "is always hitting the baby when she gets upset, or when the baby starts to cry."

The next day, the social worker interviewed mother at a daycare residence that Tracie apparently ran.[4]  Mother said she had experienced domestic violence in father's home.  She denied having hit J.P. and said father "was doing the hitting."  Mother said father and his family had verbally, physically, and mentally abused her.  She stated father had "kicked her out of the house" and kept J.P., but she had returned with Tracie to retrieve J.P. Mother and J.P. currently were living with Tracie.  Mother did not want to return to father.  Mother stated J.P. had not seen a doctor since his birth because father wanted the baby to stay inside and refused to let mother take him to the doctor.

When she moved in with Tracie, however, mother and Tracie took J.P. in for a medical exam on March 26, 2024. The doctor diagnosed J.P. with atopic dermatitis (eczema) and plagiocephaly—a condition that occurs when a baby sleeps or stays on his or her back "a lot."  The condition was not harmful, but J.P. was referred to a craniotech for a helmet to correct the condition.  J.P. also had not had his childhood immunizations.

---

[3]     M.H. is described as both paternal aunt and paternal great-aunt.  She appears to have been father's aunt (paternal great-aunt).

[4]     Tracie ran several daycares in the Los Angeles area.

4

Mother told the social worker she "had mental health issues" and had been diagnosed with anxiety. Mother stated she "used to have a therapist and take psychotropic medications but stopped because father . . . forced her to stop." Mother was willing to seek help from a therapist and resume taking her medications. Mother explained she'd had seizures since she was a child and could not drive—she relied on her family for transportation. She said she never cared for J.P. alone. Mother told the social worker she was seeking custody of J.P. and a restraining order against father.

The social worker also questioned Tracie. Tracie said the abuse allegations against mother were false—she had no concerns about mother physically abusing J.P. Tracie said J.P. had been "living in bad conditions" when mother was living with father and his family. Tracie had been caring for J.P. and providing support for mother for almost a month. She had helped mother enroll in public services, taken J.P. to see the doctor, and provided a home for them both.

Tracie told the social worker maternal grandmother had been on drugs when mother was a baby. Tracie had taken mother into her care. Tracie also told the social worker that mother had been diagnosed with mental illness, specifically, "schizophrenia, bi-polar, multiple personality disorder, anxiety, and depression." Tracie was worried about mother not addressing her mental health issues. Tracie told the social worker the maternal family would "step in to help raise and keep baby [J.P.] safe"—mother had "a lot of support from her aunties, and siblings." Tracie had seen mother care for J.P., and mother was appropriate. Due to mother's seizures, Tracie supervised mother and did not leave her alone. Tracie was willing to do

a home assessment.  She agreed to have J.P. and mother in her care, and to help mother file for legal custody and a restraining order against father.

The next day, April 5, 2024, mother gave the social worker J.P.'s medical records and court documents.  The court had ordered parents to share 50/50 custody of J.P., but J.P. was to remain with mother until the next court date, April 25, 2024.  The court had granted a restraining order in part until that court date.

On April 24, 2024, Tracie called the social worker to inform DCFS that mother had left her home with J.P. and was headed to father's house.  Tracie was worried about J.P.'s safety:  mother had left without a car seat, diapers, or baby food, and the restraining order against father still was in effect.  DCFS went to father's home address—paternal grandmother's home—with law enforcement.  Paternal uncle answered the door and said father and mother had taken J.P. to a motel.  He gave the social worker permission to enter the home.  The social worker observed signs of neglect:  stained carpet and sticky substances on the floors; piles of clothes and trash; broken kitchen cabinets with unknown substances and trash on the counters; reptiles in cages on the ground; and a dirty, broken bassinet on the floor where J.P. slept.

The social worker called Tracie to discuss a safety plan for J.P.  Tracie was concerned with both parents' mental health.  She stated that since mother had been living with father, he had "stopped" mother from taking her medications.  Tracie had been "on the verge of getting [mother] reconnected" with a psychiatrist when mother had left.

Social workers interviewed parents at their motel. Parents had violated the restraining order. The social workers discussed DCFS's concerns about J.P.'s medical needs and the family's current living conditions. Father said the family had been living with paternal great-aunt, who would not let them leave the house because she feared she'd be evicted for having unauthorized guests. The family then moved back into paternal grandmother's home. Father said the house " 'look[ed] a mess' " because paternal grandmother was " 'getting her carpet done.' " Parents planned to return to paternal great aunt's home. Parents agreed to a seven-day safety plan requiring J.P. to stay with Tracie with monitored visits for parents.

On April 26, 2024, DCFS placed J.P. into protective custody after receiving court authorization. DCFS filed an addendum report the day of the May 1, 2024 detention hearing. The report noted J.P. was placed in relative caregiver Tracie's home. According to Tracie, J.P. was doing well in her care. She had taken J.P. to be fitted for his helmet and was doing exercises with him. J.P. was moving more, though his legs appeared weak. At the detention hearing, mother entered a general denial and submitted on the child's detention. The court detained J.P. and ordered separate, monitored visitation for parents.

2. *Jurisdiction/disposition reports and hearing*

DCFS filed its jurisdiction report on May 30, 2024. Mother's restraining order against father had been dissolved after she failed to appear at the hearing. DCFS noted J.P. now was placed with "resource parent" J.B. The dependency investigator (DI) met with J.B. on May 22, 2024. J.B. said J.P., then eight months old, ate well, but spit up a lot. He was not yet meeting developmental milestones. He was trying to—but could

7

not yet—hold a bottle, push himself up, and roll over. He was able to make eye contact but did not respond to his name.

J.B. had known mother's family for a long time. J.B. said she had let mother and the baby stay in her home for a few weeks as a favor to Tracie—mother needed a place to stay and J.B. had a spare room.[5] Mother had a seizure while staying with J.B. J.B. called an ambulance, but mother was released from the hospital and returned to J.B.'s home. J.B. said that, while mother was living with her, J.B. "had to regularly give [mother] directives such as telling her to bathe and to eat." She also had to direct mother to pick up J.P. and to feed him. If J.P. cried, mother would tell him to wait—while she ate—or would take 20 minutes to make a bottle for him. At times, J.B. called Tracie for support because "she did not want to have to nag [mother] constantly." J.B. described mother as "sweet" but " 'not there at all.' " She said mother "seems to behave like she's 14- or 15-years-old." J.B. was concerned about mother's ability to make appropriate decisions.

A few days after mother had her seizure, she left J.B.'s home with the baby and returned to father. (That apparently was the point in late April when DCFS and law enforcement went to father's home to retrieve J.P. from parents and obtained the order to detain J.P.)

J.B. told the DI that parents had not reached out since J.P.'s placement with her. Visits were scheduled to begin

---

[5]     From what we can tell, before J.P. was detained, mother had been staying at J.B.'s home, rather than Tracie's home, as mother and Tracie initially had reported.

the next week.  The DI had difficulty reaching parents.  Mother said she could meet with the DI only when father did.  Parents were living together again.  Whenever the DI called mother, father answered the phone.  During a phone conversation on May 22, 2024, father told the DI that mother did not have any mental health issues, only seizures.

Parents scheduled an interview with the DI for May 30.  The DI interviewed father over the phone.  Due to time constraints, the DI arranged to speak with mother the next week.  During his interview, father again denied that mother had mental illness.  He told the DI that he and mother were " 'going to the doctor and getting the paperwork and the proof will show that [mother] doesn't have schizophrenia or bipolar.  They're using that against her because she's soft and she's weak, she's not strong enough to stand up to them.' "  By " 'they' " and " 'them' " father meant Tracie.  Father stated mother was not taking any medication because she didn't have a mental health diagnosis.  He said mother's medication was for her seizures.  Father texted the DI photos of mother's medications (folic acid, Levetiracetam, and Lamotrigine).  Father explained mother was not herself when she had a seizure—she " 'won't answer [questions] in a way that makes sense.' "  Mother had seizures once or twice a month.  Father stated that Tracie " 'manipulates and . . . controls' " mother.

Father also told the DI that he and mother temporarily had moved back into paternal grandmother's house, which still needed repairs.  They planned to move out that weekend.  The DI asked father about visits with J.P.  He admitted parents had not visited yet, stating, " 'It's going to hurt us more to know we can't take him with us. . . .  We miss him a lot, but it'll hurt [mother]

9

more to see him and not be able to take him.' " The DI explained monitored visits typically started at the DCFS office before transitioning to other venues, but father did not want to visit J.P. "in a room." As of June 5, 2024, parents still had not visited J.P. That same day, the social worker met with parents outside their home—they wouldn't allow the worker to come inside. Father signed a visitation agreement. Mother said she could not write her name due to carpal tunnel syndrome and scribbled on the agreement. Parents missed their visits scheduled for June 7 and June 10.

DCFS's report noted father had been the primary contact person in almost all of its interactions with parents since the detention hearing. DCFS was worried father was asserting "coercive control" over mother. The report noted father isolated mother from others and "limit[ed] her ability to engage with others when he is not present." DCFS also was troubled by parents' lack of visitation and engagement with J.P.—they were "not prioritizing the parent-child bond or the benefits of attachment on child development." DCFS believed court intervention was "necessary to ensure [J.P.'s] safety and well-being and to prevent future abuse/neglect."

The DI was unable to reach mother to interview her before DCFS filed its supplemental report on June 12. The DI also had been unable to reach Tracie and paternal great-aunt. At mother's counsel's request, the court continued the jurisdiction hearing to July 15, 2025 to give DCFS an opportunity to interview her. When the court asked, mother's counsel responded she had "[n]othing further."

DCFS filed a supplemental report on July 5, 2024. J.P. remained placed with J.B. On June 16, 2024, the DI interviewed

mother by phone.  She was alert, coherent, and cooperative. Throughout the interview, however, mother would ask the DI to hold while she "check[ed]" with father "about some of her answers."  At times, the DI could hear a male voice murmuring unintelligibly from mother's side of the call.

Mother denied that she had hit father or purposefully scratched father—she was in " 'seizure mode.' "  Mother told the DI Tracie had " 'made it all up,' " and it was Tracie who had called the police, not father.  Mother also said father never " 'laid his hands on me ever.' "  Mother admitted she violated the restraining order and returned to father but said she did so " 'because of the abuse at [J.B.]'s home.' "  Mother complained that J.B. would not let mother cook or buy her own food or clean her own or J.P.'s clothes.  Mother said J.B. " 'only made seafood and vegetables, she never made full meals, no meat or anything.' "  Mother said she had lost weight as a result.

Mother also denied the allegations about her mental health.  She said the " 'only thing' " she had was anxiety and seizures.  Mother said she last saw her neurologist for her seizures in April and took the medication Kepra for them. Mother said she had seen a psychiatrist in the past, and he told her she only had anxiety " 'and that's not a mental problem.' "  Mother continued, " 'I'm not bipolar, I'm not schizophrenic, I don't have multiple personality disorder.  I am a very loving person and I have never wanted to hurt anyone. I have never heard voices.  I have never wanted to harm anyone. There's nothing wrong with me except for my anxiety and my seizures.' "  Mother said she stopped seeing her psychiatrist because she " 'didn't feel like [her] anxiety was bad' " and felt it had " 'gotten better.' "  The DI told mother it was important

11

for the DI to check with mother's service providers to verify mother's statements about her lack of mental health diagnoses and to help DCFS provide her with supportive services. Mother stated she and father "would be going to the doctor to get a printout of her diagnoses and would provide it to the court."

Mother also told the DI that she and father had not moved from paternal grandmother's home—they still were trying to find a place. Mother confirmed she had not visited J.P. yet but said a visitation schedule had been created. However, as of July 5, neither parent had visited J.P.

On July 15, 2024, the court held a combined adjudication/disposition hearing. The court admitted DCFS's reports into evidence by reference. Counsel for DCFS and for J.P. asked the court to sustain the petition. Mother's and father's counsel asked the court to dismiss all counts. With respect to the b-2 count, mother's counsel argued there was insufficient evidence to establish by a preponderance of the evidence that mother had "schizophrenia, bipolar, multiple personality disorder, and that these alleged disorders impact her ability to care for the child." Counsel noted mother had been forthcoming about her seizure disorder and anxiety diagnosis but had denied having been diagnosed with the other disorders. Counsel also argued there was no proof that mother's medications were prescribed for anything other than her seizure disorder. Nor was there evidence that mother had exhibited any behaviors harmful to J.P. "that would stem from these disorders"—she was not suffering from delusions, hallucinations, or mood swings. Mother also was alert and coherent during her telephonic interview with the DI.

DCFS's counsel argued there was "ample evidence regarding mother's mental health," including mother's own

admissions and Tracie's statements.  Counsel argued that if left untreated, mother's mental health issues "could lead to things that le[d]" to DCFS's allegations about the "unkempt and unsafe home," and to poor decisionmaking, "such as going back to a person who is abusive."  The court sustained counts a-1, b-1, and b-2 of the petition, finding those allegations "to be true in their entirety," and declared J.P. a dependent of the juvenile court under section 300.

The court proceeded to disposition.  Through counsel, mother asked the court to release J.P. to her "with a safety plan of living with the paternal relatives in the home for now."  J.P.'s counsel believed the domestic violence issues between parents were due to "mother's mental health diagnosis/neurological issues."  Counsel asked the court to order mother to submit to an Evidence Code section 730 evaluation "so that we can address these issues better," and to a neurological exam to address her seizures.  The court removed J.P. from parents' custody, found J.P.'s "current placement [was] appropriate," and ordered DCFS to provide family reunification services.

For mother's case plan, the court ordered mother to attend an anger management program; to participate in conjoint counseling with father, mental health counseling—including a psychological assessment and psychiatric evaluation, and individual counseling; and to take all prescribed psychotropic medications.  The court ordered DCFS to refer mother "for a neurological exam to address her seizures."  The court also ordered mother to submit to the requested Evidence Code section 730 evaluation, "[i]n light of the mental health counseling and the fact that the court is unsure of the actual situation, sounds like there was some mental health treatment offered to her

13

previously." The court granted mother monitored visitation with J.P. three times a week, for three hours each visit, and gave DCFS discretion to liberalize mother's visits.

Toward the end of the hearing, father's counsel informed the court that father had safety concerns about J.P. in non-relative caregiver J.B.'s home—father had heard J.B. had acted unsafely with another foster child in her care. Father wanted DCFS "immediately" to assess the child's safety and to "continu[e] to make best efforts" to place J.P. "with family." J.P.'s counsel recently had seen J.P. in J.B.'s home and did not know about any other foster child. The court asked father's counsel to prepare a relative placement information sheet "[s]o placement might be considered down the road." The court set a six-month review hearing date and ordered DCFS to report on whether it had "considered other relatives for potential placement" and how mother was doing with her services.

Mother appealed from all appealable orders made at the July 15, 2024 adjudication/disposition hearing.

3.   *ICWA inquiry and findings*

In its detention report, DCFS stated father had denied any known Indian ancestry on April 3, 2024, and mother and Tracie had denied any known Indian ancestry on April 4. On May 1, 2024, father filed an unsigned parental notification of Indian status (ICWA-020) form. He indicated none of the categories listed under the heading "Indian Status" applied to him. Mother filed a signed ICWA-020 form on May 1 and also indicated none of the "Indian Status" categories applied to her. At the detention hearing, the juvenile court explained ICWA to parents and noted they each had discussed the issue with their respective attorneys. The court acknowledged each parent had denied having Indian

14

ancestry and thus found it had no reason to believe ICWA applied. The court ordered DCFS to make ongoing inquiries and to comply with its ongoing ICWA obligations. The court told parents the social workers would be "digging deeper" and talking to grandparents and extended family members.

On May 30, 2024, the DI asked father about possible Indian ancestry. He stated he had no knowledge of J.P. having any Indian ancestry. Father also denied that he, paternal relatives, mother, or maternal relatives had Indian ancestry. On June 16, 2024, the DI asked mother if she knew whether J.P. had any Indian ancestry, and mother said no. Mother also denied that she, maternal relatives, father, or paternal relatives had Indian ancestry.

## DISCUSSION

### 1. *Post-judgment evidence*

DCFS filed a separate request asking us to take judicial notice of the juvenile court's January 29, 2025 order designating Tracie as a co-holder of J.P.'s educational rights and identifying her as his "relative caregiver," the court's minute order filed after the January 29, 2025 review hearing identifying parents and Tracie as co-educational rights holders, and an attorney order signed by the court on March 4, 2025 that orders DCFS to interview/attempt to interview all known and available extended family members about J.P.'s Indian status. Mother objects to the request in her reply brief. Mother argues that, as stated in *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1094 (*Kenneth D.*), "absent exceptional circumstances, a reviewing court may not generally consider postjudgment evidence to conclude [an ICWA inquiry error is] harmless." Mother contends DCFS has not established the existence of exceptional circumstances.

15

We do not grant the request for judicial notice to establish DCFS has made an adequate ICWA inquiry or to determine if any ICWA error was harmless.  Rather, we consider the court's order requiring DCFS to interview extended family members to determine whether we can grant mother any effective relief.  Similarly, we consider the juvenile court's January 2025 orders to determine if we can grant mother effective relief on her challenge to DCFS's investigation of J.P.'s relatives under section 309, subdivision (e).  Accordingly, we now grant DCFS's request for judicial notice in its entirety.  (Evid. Code, §§ 452, subds. (a), (d), 459, subds. (a), (b).)

**2.**    ***Mother's challenge to the jurisdictional finding***

Mother contends substantial evidence did not support the b-2 count's allegation that she was diagnosed with schizophrenia, bipolar disorder, and multiple personality disorder or that her alleged mental and emotional problems placed J.P. at risk of serious harm.  DCFS contends mother's jurisdictional challenge should be dismissed as moot because the other sustained counts each provide an independent basis for the court's jurisdiction over J.P.

a.    *Mother's challenge to the b-2 count is moot*

"[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error."  (*In re N.S.* (2016) 245 Cal.App.4th 53, 60, quoted by *In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)  "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' "  (*D.P.*, at p. 277.)  An appeal may be rendered moot where "jurisdictional findings have been made as to both parents but only one parent brings a challenge."  (*Id*. at p. 283.)  An appeal is not moot,

16

however, where the jurisdictional finding against the appealing parent " 'serves as the basis for dispositional orders that are also challenged on appeal.' " (*Ibid*.)

Mother's appeal from the b-2 count jurisdictional finding is moot. Mother does not challenge the other jurisdictional findings the court made against her and father based on domestic violence. Father has not appealed at all. Accordingly, even if we were to reverse the b-2 count, J.P. would remain a dependent of the juvenile court based on both mother's and father's conduct. (*D.P., supra*, 14 Cal.5th at p. 283 ["[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." ' "].) Critically, mother does not independently challenge the dispositional findings and orders removing J.P. from her custody or requiring her to participate in mental health services. Indeed, at the disposition hearing, mother's counsel did not object to—nor ask the court to change— mother's case plan ordering her to participate in a psychological assessment and psychiatric evaluation, and to take all prescribed psychotropic medications. Nor did she object to the court's order that she submit to an Evidence Code section 730 examination. Accordingly, mother has not shown how reversal of the b-2 count would have a tangible effect on her legal status or conduct.

    b.    *We decline to exercise discretionary review*

Even if a case is moot, however, "courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra*, 14 Cal.5th at p. 282.) Generally, that discretion is exercised "when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence

17

of the controversy between the parties,' or 'when a material question remains for the court's determination.' " (*Ibid.*) Dependency proceeding appeals are "particularly prone to mootness problems," however. (*Id.* at p. 284.) Our high court, therefore, has identified a non-exhaustive list of factors for assessing whether a court should exercise discretionary review of a moot appeal in a dependency proceeding. (*Id.* at pp. 285–286.)

Courts may consider (1) "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction" ' "; (2) "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct"; and (3) "why the appeal became moot." (*D.P., supra*, 14 Cal.5th at pp. 285–286.) Although "no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal," a court ultimately "should be guided by the overarching goals of the dependency system" in deciding whether to exercise that discretion on a case-by-case basis. (*Id.* at pp. 286–287.)

Mother contends discretionary review is appropriate here because diagnoses of schizophrenia, bipolar disorder, and multiple personality disorder are "highly stigmatized by our society and carry immediate, corrosive implications—not only in how mother is perceived by social workers and those monitoring her visits with [J.P.] in the instant case, but in snap judgments that may be made about the mother in any future family law or dependency case." "Though stigma alone will not sustain an appeal, a court may consider the nature of the allegations against the parent when deciding whether discretionary review is proper.

18

The more egregious the findings against the parent, the greater the parent's interest in challenging such findings." (*D.P., supra,* 14 Cal.5th at p. 286.)

We understand that a mental health diagnosis such as those mother contests can be stigmatizing. Nevertheless, when considering the circumstances here, we find the potential stigma associated with the specific mental health diagnoses of schizophrenia, bipolar disorder, and multiple personality disorder —and the speculative future harm from such diagnoses that mother claims—do not weigh in favor of exercising our discretionary review.

We can infer the juvenile court did not sustain the b-2 count based only on the diagnoses supported by Tracie's statements to DCFS. The b-2 count also alleged mother's "mental and emotional problems, *including*" anxiety and depression— diagnoses mother does not challenge—rendered her "unable to provide regular care for" J.P. (Italics added.) The b-2 count alleged mother failed to take her prescribed psychotropic medication and "failed to maintain consistent mental health treatment." Mother admitted to these facts. In her initial conversation with the social worker, she admitted she had "mental health issues," had been diagnosed with anxiety, and had been seeing a therapist and taking psychotropic medication until father "forced her to stop." In her restraining order request, mother declared father "would not allow me to go to my psychiatric appointments for my mental health or go get my prescriptions so it affected my mental health." Father also told DCFS that mother suffered from both a seizure disorder and "a history of mental health."

Accordingly, even if we were to strike the challenged diagnoses, mother still would face some alleged stigma as ample evidence in the record indicated she suffered from mental health issues for which she required psychiatric care. Nor does mother contend her case plan would have been different had the sustained b-2 count stated only that she had been diagnosed with anxiety and depression.

Moreover, contrary to mother's contention, the record amply demonstrates mother had mental health issues that endangered J.P.'s "physical health and safety" and placed him "at risk of serious physical harm, damage, and danger." A child falls under the jurisdiction of the juvenile court under subdivision (b)(1) of section 300 if, as relevant here, "there is a substantial risk that the child will suffer[ ] serious physical harm or illness, as a result of" the inability of the parent to provide regular care for the child due to the parent's mental illness. (§ 300, subd. (b)(1)(D).) DCFS must prove by a preponderance of the evidence: "(1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601; *In re L.W.* (2019) 32 Cal.App.5th 840, 848.) "[H]arm may not be presumed from the mere fact of a parent's mental illness." (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050.)

Here, there was sufficient evidence from which the juvenile court could find mother's untreated mental health issues impaired her ability to care for J.P. and thus placed him at an ongoing risk of harm. Mother demonstrated both an inability to put J.P.'s needs first and a lack of insight as to how her mental health issues posed a risk to him. Until Tracie became involved,

20

mother had not taken J.P. to see a doctor. J.B. observed that mother let J.P. cry, waiting until she finished eating before feeding him or taking 20 minutes to fix his bottle. J.B. had to remind mother to pick J.P. up and to feed him. J.B. described mother as " 'not there at all' " and acting like a teenager. Mother did not visit J.P. after he was detained despite the importance of forming a parent-child bond with him while he was so young. According to father, it would " 'hurt [mother] more to see [J.P.] and not be able to take him.' "

Alarmingly, mother took J.P. back to father's home—paternal grandmother's house—despite having told DCFS that father had abused her, had kept her from taking J.P. to the doctor, and had forced her to stop taking her medication and seeing her therapist. Mother left J.B.'s without taking any supplies for J.P.—then eight months old—and took him to an unsafe environment. Even after J.P.'s detention, mother remained with father in paternal grandmother's home and—though coherent—seemingly could not answer the DI's questions without first consulting father.

Moreover, despite mother's initial willingness to resume psychiatric treatment and medication—and having told the social worker father forced her to stop that treatment—mother minimized her anxiety after she returned to father. She told the DI she had stopped seeing her psychiatrist because she " 'didn't feel like [her] anxiety was bad.' " She felt it had " 'gotten better.' " Mother told the DI she would get documentation of her mental health diagnoses—or lack thereof—and provide it to the court, but she never did. Mother also recanted her domestic violence accusations against father. Based on the record, the juvenile court reasonably could conclude that, without court intervention,

21

mother's mental health issues would remain untreated and pose an ongoing risk to J.P., who was only 11 months old at the adjudication hearing.  (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [recognizing "denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision" but finding that was not the case there].)

As we conclude the record supports the jurisdictional finding that mother's mental health issues placed J.P. at a substantial risk of harm, our review of whether the evidence supports a finding that mother had been diagnosed with schizophrenia, bipolar disorder, and multiple personality disorder would not result in our reversal of the b-2 count.  And, as DCFS notes, Tracie's statement that mother received those diagnoses would be part of the DCFS record—and available in any future dependency or family law proceeding—even if we were to strike those allegations.  Moreover, the issue here did not become moot because mother promptly completed her case plan, and the unchallenged jurisdictional findings involved conduct just as severe as the challenged finding.  (See *D.P., supra*, 14 Cal.5th at p. 286.)

Finally, we do not conclude the "overarching purposes of the dependency system . . . counsel in favor" of our discretionary review.  (*D.P., supra*, 14 Cal.5th at pp. 286–287.)  The findings mother challenges do not involve particularly egregious conduct —such as substantial physical and sexual abuse—where preservation of the family, and the child's emotional and physical well-being, could make discretionary review appropriate.  (See

22

*id.* at pp. 285–286 [citing cases where courts elected to review " 'pernicious' " findings that parent exposed children to a substantial risk of physical and sexual abuse].)

**3.    *Mother's ICWA challenge is moot***

Mother contends DCFS and the court failed to comply with their initial inquiry duties under Cal-ICWA. She asks us to conditionally reverse the disposition order and remand the matter with directions to DCFS to comply with the inquiry requirements under section 224.2, supported with proper documentation as required under rule 5.481(a)(5) of the California Rules of Court.

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' " (*Dezi C., supra*, 16 Cal.5th at pp. 1128–1129, quoting 25 U.S.C. § 1902.) Under Cal-ICWA, the juvenile court and DCFS "have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*Dezi C.*, at pp. 1131–1132, quoting § 224.2, subd. (a).)

Under the current version of section 224.2, DCFS's duty to inquire arises when it is first contacted about the abuse or neglect of a child, and on DCFS's first contact with the child or the child's family. (§ 224.2, subd. (b)(1); see also *Kenneth D., supra*, 16 Cal.5th at p. 1099.) At first contact with each family member, including extended family members, DCFS must ask if the child is or may be an Indian child. (§ 224.2, subd. (b)(1).)

23

When DCFS takes a child into its temporary custody, its duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).)[6] And at the first hearing on a petition, the juvenile court "shall ask each party to the proceeding and all other interested persons present whether the child is, or may be, an Indian child, [and] whether they know or have reason to know that the child is an Indian child . . . ." (§ 224.2, subd. (c); see also *Kenneth D.*, at p. 1099, quoting former § 224.2, subd. (c).)

The juvenile court may find ICWA does not apply to a child's proceeding if it finds DCFS's "inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134; § 224.2, subd. (i)(2).) The juvenile court's finding that ICWA does not apply thus implies that DCFS fulfilled its duty of inquiry. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

We generally review the juvenile court's factual finding that ICWA does not apply for substantial evidence. (§ 224.2,

---

[6] Extended family member "has the same meaning as defined by the law or custom of the Indian child's tribe," if such a law or custom exists. (§ 224.1, subd. (c)(1).)

subd.(i)(2) [juvenile court's finding that ICWA does not apply to the proceedings is "subject to reversal based on sufficiency of the evidence"].) "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

Here, the record demonstrates DCFS asked mother, father, and maternal great-aunt Tracie about J.P.'s potential Indian ancestry, and each parent filed an ICWA-020 form. Parents and Tracie denied having any known ancestry. Parents also denied that maternal or paternal relatives had any Indian ancestry. Although the court did not directly ask parents about their possible Indian ancestry at the initial hearing, the court directly addressed parents when it acknowledged they had spoken to their attorneys and had denied Indian ancestry. The court thus found it had no reason to believe ICWA applied. The court also explained to parents that it was ordering DCFS to "make ongoing inquiries through the life of this case," and social workers were going to "dig deeper" and talk to extended family members.

Nevertheless, as mother notes, nothing in the record indicates DCFS asked paternal extended family members with whom DCFS had contact about their knowledge of their or J.P.'s potential ancestry—specifically a paternal great aunt and a paternal uncle. According to Tracie, mother had 11 siblings and "aunties," but Tracie apparently did not provide their names or locations. Mother thus argues the court's finding that ICWA did not apply was not supported by substantial evidence because DCFS did not inquire of known extended family members as required under section 224.2, subdivision (b), and the court

25

"failed to ensure [DCFS] conducted an adequate inquiry and documented its findings for the court's review."

DCFS contends mother's ICWA challenge should be dismissed because the court's ICWA finding is not final—as DCFS's and the court's duty of inquiry is ongoing—and because the issue is moot. We agree that mother's challenge is moot. Mother already has received the relief she seeks—an order that DCFS comply with its section 224.2 inquiry duties and document its efforts.[7] (See, e.g., *People v. Gregerson* (2011) 202 Cal.App.4th 306, 321 [appeal moot where appellant already received the relief he sought on appeal].) On March 4, 2025, the juvenile court ordered DCFS to "interview/attempt to interview all known and available extended family members about whether the child is, or may be, an Indian child as required by . . . section 224.2, subd. (b)," to document its efforts, and to submit a written report on the results to the court before a hearing scheduled for June 30, 2025.

_____

[7] Mother also asks us to conditionally reverse the disposition order but that request is premature as the proceedings here are ongoing. (Cf. *Dezi C., supra*, 16 Cal.5th at pp. 1125, 1152 [finding conditional reversal of judgment terminating parental rights was required where department failed to conduct an adequate ICWA inquiry].) At the detention hearing the court found it had no reason to believe, or to know, ICWA applied "at this point." Under section 224.2, subdivision (i)(2), a juvenile court must reverse a determination that ICWA does not apply if it receives information giving it reason to believe a child is an Indian child. We can presume the juvenile court will follow its order (and section 224.2) and will have determined whether ICWA applies to this case—based on new information not before us—by the time this opinion is filed.

The court's order also states that, after it has reviewed DCFS's report and determines whether DCFS "has interviewed all available extended family members, the juvenile court shall make a finding regarding the ICWA's applicability." Even if we were to decide DCFS and the juvenile court failed to comply with section 224.2, directing the juvenile court to do what it already has done would have no practical effect and, if anything, would further delay these proceedings. (See *D.P., supra*, 14 Cal.5th at p. 276 [effective relief requires ongoing harm capable of being rectified by the outcome the appellant seeks].) Mother has not asked us to exercise discretionary review over this issue. We find no reason to do so. Accordingly, we dismiss mother's appeal on the ICWA issue as moot.

**4.    *Mother's challenge to the family finding investigation***

Finally, mother contends DCFS failed to exercise due diligence in investigating J.P.'s relatives under section 309, subdivision (e)(1), and the juvenile court failed to make an express finding under section 358, subdivision (b)(2) as to whether DCFS exercised due diligence. DCFS contends mother forfeited her challenge to its "family finding efforts" and to the court's failure to make an express finding as to those efforts, she lacks standing to challenge DCFS's family finding investigation, her challenge is moot, DCFS's investigation was sufficient, and any alleged error was harmless.

a.    *Applicable law*

When a child is removed from parental custody, the social worker must conduct, within 30 days, an investigation to identify and locate all adult relatives of the child. (§ 309, subd. (e)(1); *In re K.B.* (2023) 97 Cal.App.5th 689, 697 (*K.B.*).) " '[A]dult relatives' include all grandparents, adult relatives who are

27

'suggested by the parents,' and other adults who are 'related to the identified child by blood, adoption, or affinity' 'within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words "great," "great-great," or "grand," or the spouse of any of these persons.' " (*K.B.,* at p. 697, quoting § 309, subd. (e)(1), § 319, subd. (h)(2).) The social worker must use "due diligence in investigating the names and locations of the relatives." (§ 309, subd. (e)(3)(A).)

Within 30 days of the child's removal, the social worker also is required to give written notification to all adult relatives who have been located that the child has been removed from parental custody. (§ 309, subd. (e)(1)(A); *K.B., supra,* 97 Cal.App.5th at p. 697.) The notice must include "[a]n explanation of the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond," and "information about providing care for the child while the family receives reunification services with the goal of returning the child to the parent . . . , how to become a resource family, and additional services and support that are available in out-of-home placements." (§ 309, subd. (e)(1)(B).) The social worker also must provide oral notification of the above information—by telephone or in person—"whenever appropriate." (§ 309, subd. (e)(1).)

Rule 5.534(b)(3) of the California Rules of Court[8] also requires the social worker to give any located relative certain documents, including relative information form JV-285. (*K.B., supra,* 97 Cal.App.5th at p. 697.) Form JV-285 "asks relatives to

---

[8]     Rule references are to the California Rules of Court.

identify ways in which they may want to help the child, parents, or social worker, and to provide contact information for other relatives who might be able to help the child." (*Ibid.*)

If the court removes a child from parental custody at the disposition hearing, the court must "make a finding as to whether the social worker has exercised due diligence in conducting the investigation . . . to identify, locate, and notify the child's relatives." (§ 358, subd. (b)(2); see also rule 5.695(e)(1).) "When making this finding, the court may consider examples of due diligence that include, among other things, whether the social worker has (1) obtained information about the location of relatives; (2) reviewed the case file for any information regarding relatives; (3) telephoned, emailed, or visited all identified relatives; (4) asked located relatives for the names and locations of others; and (5) used online search tools." (*K.B., supra*, 97 Cal.App.5th at p. 698; see § 358, subd. (b)(3)(B)–(F); rule 5.637(d)(3).) "The court must document its determination by making a finding on the record." (Rule 5.695(e)(1).)

Here, the juvenile court did not expressly find DCFS exercised due diligence in conducting its family finding investigation. Nor does it appear DCFS asked the court to make such a finding in any of its reports. At the disposition phase of the July 15, 2024 hearing, father—through counsel—asked DCFS to "continu[e] to make best efforts" to place J.P. "with family." Counsel did not yet have information from father to submit a relative placement request form, however. The court asked father's counsel "to put together . . . [a] relative placement information sheet so placement might be considered down the road." The court's minute order from the hearing in turn ordered DCFS "to investigate all relatives for possible placement."

29

(Capitalization omitted.)  We thus deem the court impliedly to have found that DCFS exercised due diligence in its family finding investigation, as of the July 15 hearing.

        b.    *Mother has forfeited her challenges relating to the family finding investigation*

Mother concedes she did not directly challenge DCFS's family finding investigation and thus did not preserve the issue below.  Ordinarily, a reviewing court "will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  The purpose of the forfeiture rule "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Ibid.*)  Application of the forfeiture rule is not automatic, however.  Nevertheless, an appellate court should exercise its discretion to excuse forfeiture "rarely and only in cases presenting an important legal issue." (*Ibid.*)  In dependency matters—where the well-being of children is at stake—the reviewing court must exercise that discretion "with special care," considering the "paramount importance" of issues "such as permanency and stability." (*Ibid.*)

Mother first argues she could not object—and thus the forfeiture rule does not apply—because she had no notice of any due diligence findings.  DCFS's reports did not document its efforts to investigate J.P.'s relatives, DCFS did not ask the court to make any due diligence findings, and the court made no express oral or written due diligence findings.  We reject mother's position.  As DCFS notes, mother was represented by appointed counsel.  Counsel never objected at the adjudication/disposition hearing that the court had not made a due diligence finding as to DCFS's investigation of J.P.'s relatives.  Mother's implied

30

insinuation that her court-appointed attorney was unaware of the law and the requirements relating to relative placement is without merit.  (See *People v. Rucker* (1960) 186 Cal.App.2d 342, 346 ("A presumption exists that an attorney has performed his duty in protecting his client's interest.")  Moreover, mother does not contend she received inadequate representation.  In any event, counsel did not raise any concerns about or object to J.P.'s placement even after father's attorney mentioned father's concerns about J.B.  Nor did mother's counsel join father's request that DCFS "continu[e] to make best efforts . . . to place his child with family," or say anything—such as identify a preferred relative—when the court ordered father's attorney to provide relative information for DCFS.[9]

Mother also argues the forfeiture rule does not apply because she is challenging the court's implied due diligence findings for lack of substantial evidence.  (Citing *In re R.V.* (2012)

---

[9]     We also disagree with mother that the court's directive impermissibly shifted the burden of relative identification to father, excusing her failure to raise the issue.  As DCFS notes, in considering relative placement, "[t]he court shall order the parent to disclose to the county social worker the names, residences, and any other known identifying information of any maternal or paternal relatives of the child."  (§ 361.3, subd. (a)(8)(B); see also *In re S.K.* (2018) 22 Cal.App.5th 29, 38 [" '[t]hroughout the dependency process, the responsibility for identifying potential relative placements is shared by all participants' "].)  In any event, we do not see how the court's direction to father's counsel would excuse mother from objecting to J.P.'s placement or at least raising the family finding issue with the court.

208 Cal.App.4th 837, 848 for the proposition that "[a] challenge to the court's dispositional orders on 'the ground of insufficient evidence' . . . 'is not forfeited even if not raised in the juvenile court.' ") We disagree. In *R.V.*, the father challenged the sufficiency of the evidence to support the court's disposition order removing his child from the mother's custody. (*Ibid.*) Similarly, in *In re Javier G.* (2006) 137 Cal.App.4th 453, also relied on by mother, the mother challenged the juvenile court's findings and orders sustaining a supplemental section 387 petition and removing her children from parental custody on substantial evidence grounds. (*Id.* at pp. 456–458, 461–465.) The court reasoned the mother—who had failed to object at trial—had not forfeited her challenge to the juvenile court's finding that reasonable efforts had been made to prevent her children's removal because her appeal contested the merits of the section 387 proceedings. (*Id.* at pp. 463–464.) In contrast, as DCFS notes, mother neither challenges the court's assertion of jurisdiction over J.P. nor the court's dispositional findings removing J.P. from her custody. Mother's challenge to the court's due diligence finding simply is not a substantial evidence challenge to the underlying merits of the jurisdiction or disposition orders.

Finally, we see no reason to exercise our discretion to depart from the forfeiture rule. Mother has not raised an important legal issue. Nor is there any indication that issues relating to J.P.'s permanency and stability will be affected if we do not review the merits. Mother argues we should follow *K.B., supra*, 97 Cal.App.5th at p. 696, where the First District declined to apply the forfeiture rule to a parent's challenge—for the first time on appeal—to the juvenile court's finding that the social

32

services department exercised due diligence in its family finding investigation. We decline to do so. The court in *K.B.* specifically concluded that "[i]mposing forfeiture to bar [m]other's appeal would not be in [the children's] best interests." (*Ibid*.) In *K.B.*, however, the court had placed the children in a non-relative foster home—in other words, with a stranger. (*Id.* at p. 694.) J.P., on the other hand, initially was detained with a relative— Tracie—and then placed with "resource parent" J.B.—a long-time family friend whom DCFS refers to in its brief as a nonrelative extended family member (NREFM). Critically, minor's counsel did not object to J.P.'s placement with J.B. at the disposition hearing, nor did minor's counsel appeal on J.P.'s behalf. Accordingly, we conclude application of the forfeiture rule here will not adversely affect J.P. In any event, even if we were to consider mother's claim, she can show no prejudice as J.P. since has been placed with a relative—his great-aunt Tracie. On appeal, mother also does not suggest J.P. should be placed with a particular relative.[10]

We nevertheless encourage the court to ensure DCFS has acted diligently in its section 309 family finding investigation. If J.P. were to be removed from his current placement, the relative placement preference still would apply. (§ 361.3, subd.

---

[10] Mother merely notes that, at the disposition phase of the July 15, 2024 hearing, she asked that J.P. be released to her "with a safety plan of living with the paternal relatives in the home for now"; and father—who lived with paternal grandparents—asked that J.P. be returned to him, or, alternatively, that visits be allowed in that home with paternal grandparents to act as monitors.

(d); *In re J.Y.* (2022) 76 Cal.App.5th 473, 478 [relative placement preference applies after disposition if child's placement must change].)  We need not consider the parties' other contentions on this subject.

## DISPOSITION

We dismiss as moot mother's appeal based on the juvenile court's ICWA finding and jurisdictional findings.  We affirm the July 15, 2024 jurisdictional and dispositional orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

GAAB, J.*

---

*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.